484 S.E.2d 875

**James R. STANTON, Appellant,**

v.

**Sharon A. STANTON, Respondent.**

No. 2660.

Court of Appeals of South Carolina.

Heard March 6, 1997.

Decided April 21, 1997.

Sandra R. Parise, of Fairey, Parise, & Mills, Columbia, for appellant.

Robert L. Jackson, of Jackson & Jackson, Columbia, for respondent.

Anne M. Bell, Sumter, Guardian Ad Litem.

HEARN, Judge.

This is a child custody case. James R. Stanton (Father) appeals from the trial judge's refusal to transfer custody from Sharon A. Stanton (Mother) to him.[1] He argues the trial judge erred in failing to find a change of circumstances sufficient to warrant a transfer of custody. We agree.

## FACTS

Mother and Father are the biological parents of Nicholas, a seven-year-old boy. Nicholas has cerebral palsy and a number of other handicaps resulting from his premature birth, including brain damage, severe respiratory disorders, eye damage, and muscle damage. Nicholas also has difficulty walking, and requires regular physical and occupational therapy.

When the parties divorced in December 1990, they agreed that Mother would have primary custody of Nicholas, with liberal visitation to the Father. Father agreed to pay $50 per week in child support. The parties continued with this arrangement until July 1994, when Father sought a permanent

---

1. Mother has remarried since litigation commenced. Her new surname is Ehlke.

change of custody.[2] The parties have both remarried and live very near one another.

Father alleges several circumstances warranting a change of custody. First, he alleges Mother and her current husband have disregarded Nicholas's respiratory problems by smoking in his presence. Second, he alleges Mother fails to provide Nicholas with the therapy or schooling he needs by causing Nicholas to receive an excessive number of tardies and unexcused absences. This conduct, he asserts, has impaired Nicholas's development. Third, Father alleges Mother forces Nicholas to wear large-size clothing, thus endangering his health and safety. Fourth, Father alleges Mother exposed Nicholas to immoral conduct by allowing her boyfriend to spend the night in her home prior to their marriage.[3] In his brief, Father also alleges Mother has interfered with his access to Nicholas.

Both Mother and her present husband smoke cigarettes. Mother denied smoking in Nicholas's presence and asserted that when she smoked, she smoked outside the house in the garage. Father testified, however, that when he would pick up Nicholas for visitation, Nicholas's hair and clothes would smell like smoke and that he once saw her standing in her doorway smoking next to Nicholas. Father's private investigator testified that he saw Mother smoking one day while Nicholas was riding in the car with her. Mother denied this allegation.

In response to Father's allegations that she had impeded Nicholas's development, Mother accepted responsibility for some of Nicholas's school tardies and absences, as well as some of Nicholas's missed medical appointments, but not all of

2. A *pendente lite* order increased Father's visitation to fifty-fifty and ordered Mother not to allow non-related men to spend the night or to smoke in the home or car in the presence of the child. The order also required Mother to obtain sufficient therapy for the child and to keep Father informed about the child's health and to consult with Father concerning major decisions about the child's education and treatment. In addition, it required both parents to ensure that their child arrive on time for school and therapy appointments.

3. Father, however, also admitted having had several girlfriends who spent the night with him during Nicholas's visitation, one of whom became his current wife.

them. She also stated Nicholas was ill on some of the days he received unexcused absences.

In addition, Mother testified that Nicholas liked to wear large clothing because it was "in style." Maria Bush, a teacher of learning disabled and educationally mentally handicapped children, testified she had been Nicholas's teacher and that large clothing would make accomplishing some tasks more difficult for him.

Concerning Mother's interference with Father's access, Father reported that Mother refused to allow Nicholas to attend a family christening in New York. Mother justified her denial by having to take Nicholas to the eye doctor on the day Father planned to leave and by stating that she would miss him. She also testified that she never told Father definitively that Nicholas could go. Father also testified that Mother refused to permit the week-to-week visitation schedule to commence until almost three months after the family court judge ruled at the temporary hearing. Moreover, Father stated when he was attempting to make up visitation with Nicholas following his mother-in-law's funeral, Mother contacted Father and wanted Nicholas back. He advised her they were having dinner with Nicholas's paternal grandmother; nevertheless, Mother sent the police to retrieve the child.

The Guardian *ad Litem* recommended that custody be changed to the Father. She reviewed Nicholas's physical therapy records from July 1990 through July 1994 and compiled a list of Nicholas's absences. She testified he attended less than forty percent of his therapy while his Mother was primarily responsible for transporting him. When the Father began assisting in taking Nicholas to therapy in 1993, his attendance rose to sixty-two percent. In addition, the Guardian reviewed Nicholas's school attendance at kindergarten. She testified Nicholas had fifty-two absences in four-year-old kindergarten and twenty-seven absences and forty-four tardies in five-year-old kindergarten.

The trial judge ordered that custody remain with the Mother, finding no reason to warrant a change of custody. He ordered that visitation with the Father increase, alternating between parents on a weekly basis, including major holidays and extended time during the summer. He also ordered both

parties to share equally in paying the costs of the Guardian and expert. Finally, he reduced the amount of child support payable to Mother by fifty percent, reasoning that because Father would have visitation fifty percent of the time, his payments should decrease accordingly.

## ISSUES

Father raises four issues on appeal. First, he asserts the family court judge erred in failing to find a change of circumstances sufficient to warrant a change of custody. Second, he asserts the judge erred in providing visitation rights tantamount to joint custody without according him equal parenting rights. Third, he asserts the judge erred in calculating his child support payments. Fourth, he asserts the judge erred in not awarding him attorney fees and costs and in ordering him to pay a portion of the costs for the Guardian *ad Litem* and court-appointed psychologist.

## DISCUSSION

### A. Custody

In a custody dispute, the paramount and controlling factor is the welfare and best interests of the child. *Fisher v. Miller*, 288 S.C. 576, 578, 344 S.E.2d 149, 150 (1986). Moreover, this court may find facts in accordance with its own view of the preponderance of the evidence. *Wilson v. Wilson*, 285 S.C. 481, 483, 330 S.E.2d 303, 304 (1985); *Sealy v. Sealy*, 295 S.C. 281, 283, 368 S.E.2d 85, 87 (Ct.App.1988). In this case, the burden of showing changed circumstances was, of course, on the father. "[A] change in circumstances justifying a change in the custody of a child simply means that sufficient facts have been shown to warrant the conclusion that the best interests of the [child] will be served by the change." *Thompson v. Brunson*, 283 S.C. 221, 227, 321 S.E.2d 622, 626 (Ct.App.1984) (quoting *Skinner v. King*, 272 S.C. 520, 523, 252 S.E.2d 891, 892–93 (1979)).

Here, the Guardian *ad Litem*, both a nurse and an attorney, recommended that custody of Nicholas be transferred to Father. She based this recommendation largely on the Mother's poor record in taking Nicholas to his prescribed therapy sessions. Shortly after the parties separated in 1990,

Nicholas attended twenty percent of his therapy sessions. In 1991, he attended thirty-nine percent of the time. In 1992, his attendance at therapy dropped to twenty-two percent. Only in 1993, when the Father began assisting Mother in taking Nicholas to therapy, did Nicholas's attendance rise to sixty-two percent. This entry from Progressive Therapy Services dated August 12, 1992, is illustrative:

> Nicholas transferred his OT to this clinic in September 1991 following transfer of therapist. He has been scheduled for 3 times a week and decreased to 2 times a week in June 1991. This was done at request of mom based on attendance. The drive to therapy is long for mom. Attendance has been inconsistent at times. Nicholas usually averages one appointment a week, but is often late which cuts out most of OT time. Cancellations have been more frequently [sic] the last month.

Mother disputed at trial that she had been completely responsible for taking Nicholas to therapy in 1990, 1991, and 1992. The Guardian, however, testified that Mother had made it "very clear" she was primarily responsible for Nicholas's therapy.

■ We believe Mother's failure to ensure that Nicholas regularly attended his therapy sessions is a change in circumstances affecting Nicholas's welfare. While the court's expert witness could not state whether Nicholas had suffered from his missed therapy visits, we assume the therapy must be medically beneficial to him because his physician prescribed it.

This court also believes a change in custody to Father will serve Nicholas's best interest in ways. From our view of the record, Mother has exhibited an unwillingness to facilitate Nicholas's visitation with Father. Her refusal to allow Nicholas to travel to Long Island for his sister's christening as well as her decision to summon the police to retrieve Nicholas from his Father's house reveal her inflexibility on visitation issues.

We do not consider Father's other arguments with respect to Mother's smoking, Nicholas's oversized clothing, or Mother's alleged immoral conduct because we find Nicholas's record of attendance at therapy is significant enough to constitute a change in circumstances. Likewise, we need not reach Father's allegation of error concerning child support and visitation in view of our resolution of the custody issue.

■ We remand the issues of child support and visitation to the family court. In so doing, we note the trial judge ordered visitation by the Father on an alternating weekly basis, in addition to setting out a holiday visitation schedule. Although joint or divided custody is now permitted under S.C.Code Ann. § 20–7–420(42) (Supp.1996), visitation amounting to divided custody is disfavored by our supreme court.[4] *Woodall v. Woodall*, 322 S.C. 7, 12, 471 S.E.2d 154, 158 (1996) (noting it would not be conducive to a child's welfare "to be shifted and shuttled back and forth for alternate brief periods of time"). We find that in light of Nicholas's special needs, a week-to-week visitation award is not conducive to his stability.

■ We affirm the trial judge's decision on attorney fees and payment of costs for the Guardian and the expert. Even though Father was ultimately successful before this court on the issue of custody, Mother's financial situation militates against an award of attorney fees. Moreover, we do not believe the trial judge erred in ordering the parties to split equally the payment of the Guardian's and expert's costs.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

STILWELL and HOWARD, JJ., concur.

---

4. South Carolina's joint custody statute, S.C.Code Ann. § 20–7–420(42) (Supp.1996), was not in effect at the time of the hearing.