509 S.E.2d 827

**Hoyt McMillan HOUSAND, Jr., Appellant,**

v.

**April Ann Lang HOUSAND, Respondent.**

**No. 2911.**

Court of Appeals of South Carolina.

Heard Nov. 4, 1998.

Decided Dec. 14, 1998.

Rehearing Denied Jan. 30, 1999.

Dorothy Mobley Jones, of Lester & Jones, of Columbia; and Cynthia Graham Howe, of Van Osdell, Lester & Howe, of Myrtle Beach, for appellant.

Randall K. Mullins, of Mullins Law Firm, of North Myrtle Beach, for respondent.

Guardian ad Litem: Louis J. Kelaher, of Gundling & Kelaher, of Pawleys Island.

HOWELL, Chief Judge:

This appeal arises from a child custody dispute between Hoyt McMillan Housand, Jr. (the Father) and April Lang Housand (the Mother). The Father appeals from the family court's denial of his petition for a change of custody from the Mother to him. We reverse and remand.

## I.

The Mother and Father married in November 1987. They have three children, all of whom are still minors. In 1992, after the parties separated, the family court held a hearing and issued an order (the Original Order) awarding custody of the children to the Mother. At the time of the initial custody hearing, the oldest child was nearly four years old, and the youngest child was only three months old and was still being breast-fed.

In the Original Order, the family court expressed some concerns about both parties, concluding that "both parents are

immature and somewhat irresponsible." The court's concerns about the Father stemmed from his financial instability[1] and his then-recent arrest for driving under the influence. The court's concerns about the Mother stemmed from "her numerous traffic violations and her disregard of safety rules while her children are in the car." Notwithstanding these concerns, the family court concluded that both parties were fit to have custody of the children. The court used the "tender years" doctrine as a tie-breaker when awarding custody to the Mother. The award of custody to the Mother was affirmed on appeal by the Supreme Court in a memorandum opinion.

In March 1995, the Father commenced this action seeking custody of the children, alleging that his circumstances had changed for the better while the Mother's circumstances had deteriorated since the Original Order. The family court appointed a guardian ad litem and also appointed a clinical psychologist to evaluate the Father and the Mother. The psychologist concluded that the Mother suffered from a "histrionic personality" disorder and recommended that custody be awarded to the Father. The guardian likewise concluded that custody should be changed to the Father.

The family court denied the Father's request for a change of custody, concluding that the Father failed to establish a material change of circumstance. The court noted, however, that it was a close case and stated that the psychological evaluation of the parties was "compelling" and "may have been material in a previous proceeding." The court ordered the Father to pay more than $16,000 of the Mother's attorney's fees, as well the entire $16,000 balance of the guardian ad litem's fees.

## II.

■] On appeal, the Father asserts the family court erred in finding he failed to show a substantial change of circumstances warranting a change of custody. We agree.

---

1. The Father filed for personal bankruptcy approximately four years before the divorce, and, according to the Original Order, $19,000 in federal tax liens survived the bankruptcy.

To warrant a change of custody, the party seeking the change bears the burden of establishing "a material change of circumstances substantially affecting the child's welfare." *Allison v. Eudy,* 330 S.C. 427, 429, 499 S.E.2d 227, 228 (Ct.App.1998). "A change of circumstances justifying a change in the custody of the child simply means that sufficient facts have been shown to warrant the conclusion that the best interest of the child will be served by the change." *Boykin v. Boykin,* 296 S.C. 100, 101, 370 S.E.2d 884, 885 (Ct.App.1988) (citing *Skinner v. King,* 272 S.C. 520, 523, 252 S.E.2d 891, 892–93 (1979)); *accord Stanton v. Stanton,* 326 S.C. 566, 484 S.E.2d 875 (Ct.App.1997); *see also Bolding v. Bolding,* 278 S.C. 129, 130, 293 S.E.2d 699, 700 (1982) ("In order to justify a change of custody, the party seeking the transfer bears the burden of establishing a material change of conditions substantially affecting the welfare of the child."). When reviewing the family court's decision, this Court, of course, is free to find facts in accordance with our own view of the preponderance of the evidence. *See, e.g., Epperly v. Epperly,* 312 S.C. 411, 414, 440 S.E.2d 884, 885 (1994) ("In an action on appeal from the Family Court, this Court has jurisdiction to find facts in accordance with its view of the preponderance of the evidence.").

In this case, the Father presented ample evidence establishing that his situation has improved significantly since the time of the initial custody determination. First, the Father has remarried, and the evidence establishes that the children have a good relationship with their stepmother. *See McElveen v. McElveen,* 277 S.C. 97, 98–99, 283 S.E.2d 826, 827–28 (1981) ("Although we have held that remarriage alone is insufficient to justify a change of custody, it is a factor to be considered."). Moreover, the financial instability about which the first family court judge was concerned has been resolved. The Father has worked at the same job since the 1992 hearing, earning approximately $30,000 each year, and the Father is now purchasing the house he was previously renting. Thus, the Father is more than capable of providing the children with a proper home. In addition, the DUI charge pending at the time of the initial custody determination was resolved in the Father's favor, and he has had no further legal difficulties.

More important, however, than the factors mentioned above is the Father's demonstrated desire to improve his parenting

skills and his relationship with his children. During the divorce proceedings, the family court ordered the parties to attend three counseling sessions with Evelyn Califf, a "family psychotherapist." After the divorce, the Father voluntarily continued his relationship with Califf. Initially, the Father called Califf for advice on dealing with certain disciplinary and other problems that were occurring during his weekend visits with the children. Thereafter, the Father and the children attended two sessions with Califf so that Califf could observe their relationship and advise the Father on how to appropriately handle problems with the children. When the Father's remarriage became a likelihood, the Father and his then-fiancee sought Califf's help in "blending" the families—first the Father and his fiancee, and later the Father, his fiancee, and the children, attended additional sessions with Califf. By all accounts, the sessions have been beneficial. Califf testified that the Father and the children have a very good relationship, and she expressed confidence in the Father's ability to parent the children on a permanent basis.

Thus, the Father has made substantial efforts to improve his relationship with the children and to improve his skills as a parent. These actions convince us that the Father has matured substantially since the Original Order, and that he is a caring and responsible father.

By contrast, the Mother's situation has, at best, remained static, and, at worst, has significantly deteriorated since the initial custody determination. At the time of the initial determination, the Mother had recently moved from Georgetown to Rock Hill and was working as a waitress. She had previously worked in optical sales, earning approximately $30,000 per year. In the Original Order, the court described the parties as a "dual-career" family and treated the Mother's earning capacity as comparable to that of the Father.

Since the time of the Original Order, however, the Mother's employment record has been sporadic. The Mother worked in the waitress position mentioned in the Original Order for approximately five weeks before quitting. She was voluntarily unemployed for approximately a year thereafter. She then worked at a department store for approximately six months. Thereafter, the Mother worked as a sales representative for

an optical company making $24,000 per year, but quit after approximately five weeks. The Mother then worked for another optical company with a guaranteed salary of $3,000 per month, but she quit after four months. The Mother followed that position by working as a waitress in four different restaurants. She quit the first of these jobs after six or seven days, was fired from the second after six months, quit the third after approximately five months, and left the last restaurant after three months. The Mother testified that as a waitress, she typically earned approximately $30 per day, although there were occasional days when she earned as much as $100. In between these many jobs, the Mother was frequently unemployed for relatively long periods of time. In fact, after her last job as a waitress, the Mother remained unemployed after the Father commenced this action, at which time she became a substitute teacher, earning $32 per day. The Mother has turned down at least three full-time job offers, one of which would have started at $30,000 per year and would have paid up to $60,000 after three years.

The Mother's refusal to maintain steady employment might be of less concern if the Mother was nevertheless able to provide for the children. Unfortunately, the evidence in this case establishes just the opposite. The Mother lives in a government-subsidized apartment and receives government assistance in paying for the children's day care. The Mother also received food stamps for a period of approximately two years after the initial custody determination. For at least two years, certain companies or charitable organizations "adopted" the children at Christmas, and the children's names were placed on an "Angel tree" at their day-care center. Although the Mother has on occasion received help paying her utility bills, her telephone services have been cut off for non-payment "once or twice," and her electric services have been cut off once, "maybe twice at the most," again for non-payment. The Mother has also had a car repossessed because she was unable to make the payments.

Thus, our view of the evidence establishes that, notwithstanding her six years experience in optical sales and her proven ability to earn a substantial salary in that field, the Mother has chosen not to be fully employed. Sadly it is the children who have been forced to bear the financial consequences of that decision. While the Mother claims that she

gave up her career in optical sales because it required too much time away from her children, we note that the children have been in full-day day care since approximately July 1993, notwithstanding the Mother's frequent periods of unemployment. Moreover, the full-time jobs the Mother has turned down would not have required the overnight travel associated with optical sales.

Accordingly, in terms of her professional development and financial circumstances, it can hardly be said that the Mother's situation has improved since the Original Order. In addition, the Father presented evidence establishing that the Mother has left the children alone in the apartment and in the car while she runs errands, behavior that was an issue in the original custody hearing and that was specifically mentioned in the Original Order. Considering the evidence as a whole, we conclude that the Mother is still immature and irresponsible, as the family court found her to be in the Original Order.[2]

Given the substantial improvements in the Father's circumstances, we conclude that the Father carried his burden of establishing a substantial or material change of circumstances. See Ewing v. Baumrind, 283 S.C. 461, 464, 322 S.E.2d 696, 697 (Ct.App.1984) (no requirement that parent seeking a change of custody establish, in addition to a change of circumstance on the part of that parent, that the custodial parent engaged in conduct that adversely affected the welfare of the children). Moreover, when the Mother's failure to remedy her shortcomings is considered together with the improvement in

2. The Mother's continued immaturity is further evidenced by her approach towards a college education. In the Original Order, the family court noted that the Mother "has aspirations of attending college," and the Mother acknowledged at the hearing in this action that she intended to go to college after the divorce. The Mother, however, is far from realizing those aspirations. Although the Mother is eligible for various grants to defray college expenses and is entitled to additional benefits through the Veterans' Administration that apparently would pay all or most of her college expenses, she has not completed a single college course since the initial hearing. She enrolled in two courses at a technical school in York, but did not finish the semester. The Mother also registered for classes at Winthrop University, but never took the classes. When asked why she did not take the classes at Winthrop, the Mother responded, "I can't remember." Given her history, the Mother's assertion at the hearing in this action that she intends to go to college and major in education rings rather hollow.

the Father's circumstances, it becomes abundantly clear that the best interest of the children will be served by changing custody from the Mother to the Father. *See Routh v. Routh,* 328 S.C. 512, 519–20, 492 S.E.2d 415, 419 (Ct.App.1997) ("[T]he fact that [the father] is happily remarried to a wife who loves [the child], is mature emotionally, has held stable employment over the years and is in a position to offer [the child] a better home environment are compelling circumstances which along with those just mentioned [the mother's continued immaturity and lack of job stability], constitute a change of circumstances substantially affecting the welfare and best interest of [the child].").

Our conclusion that a change of custody is in the best interest of the children is buttressed by the Father's compelling evidence that the Mother suffers from a personality disorder.[3] Dr. Boland, who evaluated the Mother, the Father, and the Father's new wife, diagnosed the Mother as suffering from "histrionic personality disorder." According to Dr. Boland, persons suffering from histrionic personality disorder

> display exaggerated and short-lived emotions, are flirtatious and flighty, lack insight and integrate the experiences poorly. Their judgment tends to be undependable and highly erratic. They may appear charming to casual acquaintances but those with more enduring relationships are likely to see them as testy, irritable, antisocial and manipulative.

Dr. Boland testified that parents with this disorder "have difficulty placing the needs of the children above their own. They tend to be very self-centered, and they tend to have difficulty consistently expressing love and affection."[4]

Part of Dr. Boland's evaluation included observations of the parties with the children. His observation of the Mother with the children

---

**3.** We reached our conclusion that the Father established a substantial change of circumstance without considering this evidence of the Mother's psychological condition. Thus, we need not determine whether, in and of itself, the diagnosis of a pre-existing psychological disorder would support a change of custody.

**4.** The Father presented evidence establishing that, notwithstanding the children's asthma and allergies, the Mother continued to smoke in the apartment until a month before the hearing in this action and that the Mother may have ignored or minimized other health problems suffered

indicated a gross lack of use of discipline and parenting control on her part. The children were frequently non-compliant, defiant and disrespectful during the observation and [the Mother] consistently failed to provide any contingencies or consequences. Parents with this style of interaction tend not to provide the structured discipline that children require to develop into healthy well-adjusted adults. They may fluctuate from being passive and ignoring problems to being excessively angry when things have gone too far. In these circumstances, the children merely learn to act out and do as they please until the parent[s] verbally become[ ] angry and lose[ ] their temper.

By contrast, Dr. Boland found no evidence of any psychological problems in the Father that would interfere with his ability to be a parent. After observing the children with the Father and his new wife, Boland concluded that the Father and his wife had better "parental control of the children," which suggested that they "provided adequate discipline in the past."

■■] Given the psychological evidence outlined above and our conclusion that the Father has established a material change of circumstances since the initial custody determination,[5] we are firmly convinced that the best interests of the children will be served by changing custody from the Mother to the Father. Accordingly, we reverse the decision of the family court as to custody and remand for the establishment of an appropriate visitation schedule for the Mother.

---

by the children. This evidence certainly supports Dr. Boland's belief that the Mother has difficulty putting the needs of the children above her own needs.

5. The Mother, however, contends that no change of circumstances has been established, and notes that she now lives in a better apartment than she did at the time of the Original Order; that the Father lives in the same house as he did at the time of the Original Order; that the children's medical conditions are better than they were at the time of the Original Order; and that her psychological condition is better than it was at the time of the Original Order. While these assertions may well be true, they do not change our conclusion. By looking at each fact in isolation, the Mother improperly focuses on individual trees in a determined effort to avoid seeing the forest. When determining whether a change of circumstance has been established in a custody case, the issue is whether the evidence, *viewed as a whole,* establishes that the circumstances of the parties have changed enough that the best inter-

III.

The Father also challenges the award of more than $30,000 in attorney's fees and guardian *ad litem* fees to the Mother. In light of our decision that custody should be changed to the Father, we remand for a redetermination under the appropriate factors of the award of attorney's fees and guardian fees.

Accordingly, for the foregoing reasons, the decision of the family court is hereby

**REVERSED AND REMANDED.**

ANDERSON and STILWELL, JJ., concur.

ests of the children will be served by changing custody. *See Routh,* 328 S.C. at 521, 492 S.E.2d at 420 ("There exist no hard and fast rules for determining when to change custody and *the totality of the circumstances peculiar to each case* constitutes the only scale upon which the ultimate decision can be weighed.") (emphasis added); *see also Aiken v. Nelson,* 292 S.C. 400, 403, 356 S.E.2d 839, 841 (1987) (affirming change of custody "[b]ased upon the *totality of the evidence* and the broad discretionary powers of the trial court") (emphasis added). In this case, the totality of the evidence establishes that the Father's circumstances have substantially improved, while the Mother's circumstances have deteriorated, notwithstanding the fact that certain isolated circumstances may not have changed.