579 S.E.2d 620

**John McPherson SCOTT, Appellant/Respondent,**

v.

**Deirdre Erwin SCOTT, Respondent/Appellant,**

**And Gregory T. Martin, Defendant.**

No. 25630.

Supreme Court of South Carolina.

Heard March 6, 2003.
Decided April 14, 2003.
Rehearing Denied May 14, 2003.

C. Dixon Lee, of McLaren & Lee, of Columbia; and James Fletcher Thompson, of Spartanburg, for Appellant–Respondent.

Robert M. Rosenfeld, of Porter & Rosenfeld; and David A. Wilson, of Horton, Drawdy, Ward & Jenkins, both of Greenville, for Respondent–Appellant.

Andrew G. Goodson, of Younts Alford Brown & Goodson, of Fountain Inn, Guardian Ad Litem.

WALLER, Justice.

This is a cross-appeal from a divorce decree awarding joint custody of the couple's daughter, Caitlyn. We affirm in part, and reverse in part.

## FACTS

Appellant/respondent John McPherson Scott (Father) and respondent/appellant Deirdre Erwin Scott (Mother) married on May 18, 1991. It was the second marriage for both.

Mother had custody of Kristen Martin, her daughter from her previous marriage,[1] but Father had no children from his previous marriage. On June 30, 1993, Caitlyn was born.

Father filed for divorce in September 1998 on the ground of Mother's adultery. He sought custody of both his daughter Caitlyn and his step-daughter Kristen.[2] After a hearing in October 1998, the family court issued a temporary order on November 9, 1998, granting Father temporary custody of Caitlyn and awarding visitation to Mother every other weekend and every other Wednesday evening. The temporary order granted Mother custody of Kristen and stated that Father could have visitation with her, but this visitation would be subject to Kristen's wishes. The temporary order further designated Mother's visitation for Thanksgiving and Christmas of that year. The order did not, however, make any provisions for summer 1999 visitation. A Guardian Ad Litem (GAL) was appointed to represent the interests of Kristen and Caitlyn.

The final divorce hearing took place January 29 through February 2, 2001. At that time, Caitlyn was 7 years old and Kristen was 16 years old. During the over two years that the marital litigation was pending, Father refused to agree to any visitation not specified in the temporary order, and Mother went back to the family court no less than three times for modifications of her visitation.[3]

---

1. Kristen was born on January 22, 1985.

2. Because Father sought custody of Kristen, Kristen's biological father Greg Martin was named as a defendant. Martin, however, did not participate in the divorce hearing and did not contest Father's claim for custody of Kristen.

3. After failing to respond to Mother's request for summer 1999 visitation, Mother moved the family court which awarded Mother several weeks of summer visitation. In November 1999, Mother sought modification of her visitation which Father opposed. The family court increased her visitation to every Wednesday night and granted Mother her requested visitation over the Christmas holiday. When summer vacation approached in 2000, the GAL proposed extended visitation again for Mother. Mother made a written proposal to Father, but there was no response. Mother again moved the family court for relief. The family court awarded Mother over six weeks' consecutive visitation to Mother.

The primary issue at the lengthy divorce hearing was custody of Caitlyn.[4] Evidence regarding both Mother's and Father's capacity to alienate the other from Caitlyn was presented. For example, Kristen's relationship with Martin, her biological father, and the litigation regarding Martin's and Martin's parents' visitation with Kristen, was discussed extensively. In sum, the evidence revealed that Mother and Father worked together in an attempt to prevent both Martin and his parents from maintaining a relationship with Kristen.

Father also evidenced a capacity to alienate Caitlyn from Mother. Generally, he was inflexible regarding Mother's visitation. As discussed above, Father fought Mother's efforts regarding summer visitation and clearly would not allow Mother anything other than what was specified in the temporary order. In addition, there was the so-called "Brownie incident." Mother attended a Brownie event with Caitlyn. Father also showed up at the event and apparently was incensed by Mother's presence since it was his weekend with Caitlyn. He called the Brownie troop leader that night and threatened to have her "disbarred" as a troop leader. He subsequently removed Caitlyn from that troop.

In addition to the evidence regarding the parents' potential for alienation, there were numerous other factual issues explored at the hearing. Most were disputed—a true "he said-she said" situation. For example, there was conflicting testimony as to who was Caitlyn's "primary caretaker" prior to the parties' separation, exactly how much Father traveled with his job prior to the separation, when Mother exposed the children to her paramour, etc. Nonetheless, there was agreement that both Father and Mother love Caitlyn and that Caitlyn has a strong bond with both parents.

The GAL submitted a written report and also testified at the hearing. He noted several times that the custody issue was an extremely "close call." In his written report, he recommended that Mother get custody. During his testimo-

---

4. It was not until the middle of trial that Father abandoned his claim for custody of Kristen. Although Father and Kristen enjoyed a close relationship during the parties' marriage, the relationship apparently disintegrated almost immediately upon the parties' separation. Kristen would not visit with Father, nor would she speak on the telephone to him.

ny, he acknowledged that he considered not making any recommendation at all, but he concluded that Caitlyn would be a little bit happier with Mother and her half-sister Kristen. When asked by the family court about a joint custody arrangement, the GAL stated he did not have a problem with that since the parties lived only five blocks from each other and Caitlyn was "very bonded" with both parents.

The family court granted Father a divorce based on Mother's adultery.[5] Regarding the custody issue, the family court made numerous, detailed factual findings in the divorce decree, including that: both Mother and Father had engaged in deceitful and manipulative conduct; Mother shows dependent traits; Father demonstrates "a consistent need to control and exclude;" and both were "guilty of placing their own interests above the interests of their children."

Most significant, the family court found as follows:

Although the Court finds both parents to be fit insofar as each is able to meet the basic needs of Caitlyn, the Court has serious concerns about the propensity of both parties to place their own emotional needs above the needs of Caitlyn. **If this Court were to give sole custody of Caitlyn to either parent, the Court is convinced that the ability of Caitlyn to have a normal parent/child relationship with the other parent would be seriously compromised.** Therefore, the decision articulated hereinafter is designed to insure that Caitlyn has regular contact with both parents. It is further designed to attempt to ameliorate some of the destructive behaviors and attitudes in these parents and to teach these parents to share.

(Emphasis added). The family court found joint custody was in Caitlyn's best interest, and ordered that custody alternate between Father and Mother every four weeks.[6]

Father filed a Rule 59(e), SCRCP, motion for reconsideration. The family court made minor amendments, but denied the motion in material part. Regarding joint custody, the

---

**5.** Mother did not contest the adultery issue. She subsequently married her paramour.

**6.** In addition, the non-custodial parent during the four-week period gets a weekend visitation with Caitlyn.

124

family court noted that by statute it had the power to award joint custody. The family court further stated it was "convinced" that joint custody was Caitlyn's only hope for an "equal relationship with both parents."

## ISSUES

1. Was the award of joint custody appropriate under the circumstances of this case?
2. Is the restraining order in the divorce decree regarding overnight guests of the opposite sex overly broad and unreasonable?
3. Is Mother entitled to an award of attorney's fees?

## JOINT CUSTODY

■ Father argues the family court erred in awarding joint custody and that he should have been awarded custody of Caitlyn. In response to Father's joint custody argument, Mother maintains that although it is unusual for the family court to award joint custody, she believes the arrangement was appropriate under the unique circumstances of this case. She alternatively argues, however, that she should be awarded custody of Caitlyn if the joint custody decision is reversed. Because we find exceptional circumstances exist in the instant case, we affirm the family court's decision awarding joint custody.

■ When reviewing the factual determinations of the family court, an appellate court may take its own view of the preponderance of the evidence. *Woodall v. Woodall*, 322 S.C. 7, 10, 471 S.E.2d 154, 157 (1996). However, where there is disputed evidence, the appellate court may adhere to the findings of the family court. *Id.* Because the family court is in a superior position to judge the witnesses' demeanor and veracity, its findings should be given broad discretion. *Id.* Furthermore, the appellate court "should be reluctant to substitute its own evaluation of the evidence on child custody for that of the [family] court." *Id.*

■ The controlling factor in a custody case is the best interest of the child. *E.g., Patel v. Patel*, 347 S.C. 281, 555 S.E.2d 386 (2001). Moreover, in making custody decisions

"the totality of the circumstances peculiar to each case constitutes the only scale upon which the ultimate decision can be weighed." *Parris v. Parris,* 319 S.C. 308, 310, 460 S.E.2d 571, 572 (1995) (emphasis added).

██ This Court has stated that "[d]ivided custody [7] is usually harmful to and not conducive to the best interest and welfare of the children." *Mixson v. Mixson,* 253 S.C. 436, 446, 171 S.E.2d 581, 586 (1969). Therefore, only under "exceptional circumstances" should joint custody be ordered. *Id.* at 447, 171 S.E.2d at 586; *see also Courie v. Courie,* 288 S.C. 163, 168, 341 S.E.2d 646, 649 (Ct.App.1986) ("Divided custody is avoided if at all possible, and will be approved only under exceptional circumstances.").

In 1996, the Legislature amended the statute governing the family court's jurisdiction to specifically grant the family court the exclusive jurisdiction "[t]o order joint or divided custody where the court finds it is in the best interests of the child." S.C.Code Ann. § 20–7–420 (Supp.2002). Thus far, the only published decision to comment on this subsection is *Stanton v. Stanton,* 326 S.C. 566, 484 S.E.2d 875 (Ct.App.1997), where the Court of Appeals stated the following: "Although joint or divided custody is now permitted under S.C.Code Ann. § 20–7–420(42) (Supp.1996), visitation amounting to divided custody is disfavored by our supreme court." *Id.* at 573, 484 S.E.2d at 878–79.

██ It is our opinion section 20–7–420(42) did not change the law in this State that, generally, joint custody is disfavored. *Mixson, supra.* Nevertheless, our focus remains on the best interest of the child. *See Patel, supra;* § 20–7–420(42). The issue therefore is whether this case presents exceptional circumstances such that the best interest of the child requires an award of joint custody. We conclude it does.

██ The *Mixson* Court explained why it disfavored a divided custody arrangement:

The courts generally endeavor to avoid dividing the custody of a child between contending parties, and are particularly

7. This Court has, in the past, used the term "divided custody" to describe what in this case has been termed "joint custody," which is also sometimes referred to as "joint physical custody."

reluctant to award the custody of a child **in brief alternating periods** between estranged and quarrelsome persons. Under the facts and circumstances of particular cases, it has been held improper to apportion the custody of a child between its parents, or between one of its parents and a third party, for ordinarily it is not conducive to the best interests and welfare of a child for it to be shifted and shuttled back and forth **in alternate brief periods** between contending parties, particularly during the school term. Furthermore, such an arrangement is likely to cause confusion, interfere with the proper training and discipline of the child, make the child the basis of many quarrels between its custodians, render its life unhappy and discontented, and prevent it from living a normal life.

253 S.C. at 447, 171 S.E.2d at 586 (emphasis added, internal quotation marks and citation omitted).

The family court in this case fashioned the joint custody to alternate in four-week intervals. In our opinion, this is not a "brief" period as envisioned by *Mixson. See id.* (reversing joint custody on **daily** basis); *Stanton, supra* (reversing a **week-to-week** visitation arrangement for a special needs child). Clearly, the family court fashioned the joint custody arrangement to be the least disruptive for Caitlyn in an effort to combat the dangers generally associated with joint custody.

More significantly, however, we concur with the family court that the evidence indicates a serious concern about the effects a sole custody arrangement would have on Caitlyn because of the potential for the custodial parent to effectively alienate Caitlyn from the non-custodial parent. We hold the peculiar facts of this case amount to exceptional circumstances warranting joint custody. *See Sanders v. Sanders,* 232 S.C. 625, 103 S.E.2d 281 (1958) (affirming divided custody order).

The exceptional circumstances in this case are reminiscent of those in *Sanders.*[8] As here, the parties in *Sanders* were considered fit; both loved and wanted their children. The trial court decided that a divided custody arrangement, alternating every six months, was appropriate under the circum-

---

**8.** We note that while *Sanders* was an annulment action and this is a divorce action, the relevant circumstances regarding the custody issue are analogous.

stances. The mother appealed, arguing that divided custody would not be "as good for the children as a permanent home with her would be." This Court commented as follows:

> Divided custody is probably not the perfect solution, for problems of this kind are rarely if ever susceptible of perfect solution; **but in the circumstances of the instant case it seems the best one possible from the standpoint of the children's welfare....**

> We speak from the bench, not the pulpit; but we are moved, nevertheless, to say that had the love of these parents for their children been less [sic] selfish and more considerate, this unhappy proceeding would never have been before us.... The family structure of these people has now been wrecked. Whether it can ever be wholly restored is not for us to say. But [the trial court's] decree sheds a ray of hope upon the future relationship between these parents and their children. Obedience to that decree, and patience and charity toward each other and toward them, may yet bring to the latter happy and normal development, and to the former a more satisfying parenthood than they have heretofore known.

*Id.* at 633–34, 103 S.E.2d at 286 (emphasis added).

Although arguably not a "perfect solution," the joint custody ordered by the family court in the instant case perhaps "sheds a ray of hope" on the future relationship between these parents and their daughter Caitlyn. *Id.* We implore Father and Mother to obey both the letter and the spirit [9] of the decree.

### RESTRAINING ORDER ON OVERNIGHT GUESTS

Father takes issue with the following provision in the divorce decree:

---

9. We share Father's dissatisfaction with the family court's attempt to teach the parents how "to share" using Caitlyn as the teaching tool. It is regrettable the family court used this language in its order. *Cf. Davenport v. Davenport*, 265 S.C. 524, 527, 220 S.E.2d 228, 230 (1975) ("Custody of a child is not granted a party as a reward or withheld as a punishment."). Nonetheless, we note Father has shown he will "share" Caitlyn no more than what a court order allows.

IT IS FURTHER ORDERED, ADJUDGED AND DE-CREED that all parties be, and are hereby, enjoined and restrained from having contact with a member of the opposite sex not related by blood or marriage in the presence of either child from the hours of 10:00 p.m. until 8:00 a.m. This injunction and restriction applies to any structure or open area where the children and the party will sleep in close proximity to each other.

Father argues that this restriction is overly broad and unreasonable. For example, he contends that if read literally, Caitlyn would not be allowed to have any girlfriends sleep over when Father has custody of Caitlyn. We agree.

The Court of Appeals struck down a similar provision in *Jackson v. Jackson*, 279 S.C. 618, 310 S.E.2d 827 (Ct.App. 1983). In that case, the father was allowed to have his son visit only if the child was "not exposed to persons not related to [the father] by blood or marriage." The *Jackson* court explained as follows:

This restriction was intended to prevent the child from visiting in the presence of [the father's] live-in girlfriend. The restriction is overly broad and unreasonable as there was no finding that the presence of [the girlfriend] would adversely affect the welfare of the child.... Even if this finding had been made, the restriction is overly broad in carrying out its intended purpose. Carried to its logical extreme, it would prevent the child from entertaining his own friends at his father's home.

*Id.* at 622, 310 S.E.2d at 829 (citation omitted).

The restriction in this case likewise is overly broad and therefore is reversed. *Id.*

## ATTORNEY'S FEES

The family court concluded that neither party was responsible for the other's attorney's fees. Mother argues, however, that she is entitled to attorney's fees because: (1) she prevailed on the custody issue involving Kristen; (2) she obtained joint custody of Caitlyn when Father had had temporary custody of her; and (3) she succeeded in her attempts to modify visitation while litigation was pending. We find the family court was within its discretion to deny Mother attor-

ney's fees and therefore affirm on this issue. *See Donahue v. Donahue,* 299 S.C. 353, 365, 384 S.E.2d 741, 748 (1989) ("An award of attorneys' fees and costs is a discretionary matter not to be overturned absent abuse by the trial court."); *Cullen v. Prescott,* 302 S.C. 201, 207, 394 S.E.2d 722, 726 (Ct.App. 1990) ("The award of attorney fees is within the sound discretion of the court.").

## CONCLUSION

We affirm the family court's award of joint custody and the denial of attorney's fees, and reverse the restraining order regarding overnight guests.

**AFFIRMED IN PART; REVERSED IN PART.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.