# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Wendy Grungo-Smith, Respondent,

v.

Joseph Grungo, Petitioner.

Appellate Case No. 2023-000625

―――――――――

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

―――――――――

Appeal from York County
Thomas Henry White IV, Family Court Judge

―――――――――

Opinion No. 28243
Heard October 1, 2024 – Filed November 20, 2024

―――――――――

## REVERSED

―――――――――

James B. Richardson Jr., of Columbia; and James R. Honeycutt, of Fort Mill, both for Petitioner.

John Brandt Rucker and Allyson Sue Rucker, of The Rucker Law Firm, LLC, both of Greenville, for Respondent.

―――――――――

**CHIEF JUSTICE KITTREDGE:** In this custody modification action, the family court awarded primary custody to Petitioner Joseph Grungo (Father) in part based on the evidence and testimony of a guardian ad litem (the guardian). The court of appeals reversed, finding the family court erred in relying on the guardian's

testimony and recommendation because the case did not involve "extraordinary circumstances."  We hold the procedure employed by the family court in eliciting the guardian's testimony and custody recommendation fully complied with the applicable statute.  The statute in no manner imposes the "extraordinary circumstances" standard adopted by the court of appeals.  Moreover, we find the evidence fully supports the family court's decision that Father established a substantial change in circumstances justifying a change in custody, and the best interests of the children would be served by awarding primary custody to Father.  We therefore reverse the decision of the court of appeals and reinstate the family court's order.

## I.

## A.

Father and Respondent Wendy Grungo-Smith (Mother) have been divorced since 2012.  Prior to their divorce, they lived in Fort Mill, South Carolina, and had two children together.  The children are now seventeen and sixteen years old, respectively.

In the divorce decree, Father and Mother agreed to joint custody of the children, with Father having custody on Mondays and Tuesdays, Mother having custody on Wednesdays and Thursdays, and the parties alternating custody every other weekend.  The divorce decree additionally provided, among other terms, that (1) neither party was obligated to pay child support to the other, but, instead, both would pay equal shares of childcare costs directly to the provider; (2) if either parent had the children in their care greater than fifty percent of the time, the other parent would "contribute to the support and maintenance of the children"; (3) the parties would enroll the children in private schools upon which they had mutually agreed; and (4) the parties would abstain from using profanity or making derogatory comments about one another in front of the children and prevent others from doing so as well.

At the time of the divorce, Father and Mother both lived separately in Fort Mill, within a short drive of one another.  Subsequently, while Father remained in Fort Mill, Mother remarried twice and moved six times, bouncing around between Charlotte and Gastonia, North Carolina.  As a result, the parties typically lived between thirty-five minutes to one-and-a-half hours apart—one way—depending on the time of day and the resulting traffic around the Charlotte metro area.  Primarily due to the distance separating the parties, Mother and Father eventually departed from the strict joint custody schedule: Mother kept the children the majority of the time, with Father taking them overnight every other Friday and Saturday and coming

to visit them on many (but not all) Mondays and Tuesdays for a few hours after school.

## B.

In 2019, Mother filed a custody modification action in the family court. Mother specifically alleged a change in circumstances following the 2012 divorce decree, namely, that Father had not taken full advantage of his right to fifty percent of the children's time. She requested the family court award her primary custody of the children and order standard visitation for and child support from Father.

Father counterclaimed, also requesting primary custody due to numerous changes in circumstances, including, among others, the facts that: (1) Mother's second husband, Michael Caswell, was convicted of a heinous crime involving one of the children;[1] (2) Mother and her third husband, Ken Smith, "constantly belittled" Father in front of the children; and (3) Mother and Smith's conduct towards one another and the children rendered Mother's house "not suitable." Like Mother, Father requested standard visitation for Mother and an order requiring her to pay child support.

## C.

The case came to trial in June 2020, when the children were eleven and twelve years old. Mother testified at length about the numerous houses in which she had lived with the children. In relevant part, Mother explained that, since the divorce, the children had not attended the same school for more than one consecutive year, and she had not obtained Father's consent to any of the school transfers despite the provision in the divorce decree requiring her to do so. Mother claimed that many of their moves had been driven by a desire to either relocate to a larger house or live closer to the children's then-current school. However, according to Mother, the series of moves had come to an end given a new condition in her 2019 mortgage that required her to live in her present house for at least fifteen years.

Mother complained Father never exercised his full custody time even though she did not prevent him from doing so. She testified that, prior to schools being closed for the COVID-19 pandemic, Father would pick the children up alternate weekends on Fridays after he got off work and keep them through Sunday evenings. Likewise, Mother explained that on Mondays and Tuesdays, Father would not keep the children overnight but instead would take them out to eat and bring them home by

---

[1] As a result of the conviction, Caswell is currently in prison in North Carolina.

8:00 p.m. so they could get to sleep before school the next day.

In response, Father testified that Mother's frequent moves negatively impacted his ability to spend all of his allotted custodial time with the children due to the "[d]istance, traffic, [and] fuel." As a result, Father claimed, he missed some Mondays and Tuesdays with the children prior to the pandemic "depending on work and traffic." However, he stated that on most Mondays and Tuesdays, he would pick the children up and take them to dinner or to shop for things they needed for school before returning them at bedtime. Father explained he did not usually keep the children overnight on Mondays and Tuesdays in order to ensure they got enough sleep and arrived at school on time the following morning.[2] Father testified that, once the pandemic began and transporting the children to Gastonia in time for school was no longer an issue (because the children's school transitioned to remote learning), he took the children all of the days and nights allotted to him under the divorce decree. Father admitted he had never taken formal legal action to enforce the term of the divorce decree that required Mother and Father to agree on the children's school, explaining he had not done so "[d]ue to financial reasons, [] and to eliminate stress from the children."

## D.

Next, an appointed guardian ad litem submitted her report to the family court without objection.

In relevant part, the guardian's report revealed that Mother would bless the children with oil before she allowed them to talk to the guardian so that they would not say anything negative about her or Smith. In spite of this practice, the children reported to the guardian that Mother's third husband, Smith, called them vulgar and racist names, including "dirty niggers," "dickheads," and "brats." Similarly, the report stated the children informed the guardian that Mother and Smith said "bad things about [Father] and call[ed] him names," including "dickhead." The children additionally disclosed Mother and Smith argued "a lot," showing the guardian videos

---

[2] Father also stated he did not keep the children on Monday and Tuesday nights because taking the children to school in Gastonia during Charlotte's peak rush-hour traffic made it impossible for him to make it to work back in Fort Mill on time. Father did acknowledge that while he had some flexibility in setting his work hours and could possibly arrive late on Mondays and Tuesdays after keeping the children overnight, "Starting work at ten o'clock wouldn't allow [him] enough time to complete the work that [he had to do]."

of these arguments secretly recorded on the children's cell phones. The report finally noted the guardian had personally observed that, in the house the children had lived with Mother immediately prior to the hearing, the locks on their bedroom doors were reversed so as to allow someone to lock them in from the outside.

In contrast, the report noted the children told the guardian that at Father's home, things were "peaceful," with "zero stress" and "no arguing." The children advised the guardian they preferred being at Father's house because there was "zero stress" and "so much peace," whereas at Mother's house they "d[idn't] have peacefulness." They "expressed to [the guardian] on a number of occasions that they fe[lt] comfortable at their dad['s] and [were] more uptight at their mom's."

The guardian's report did not make a recommendation on custody of the children, stating, "Due to the Guardian ad Litem guidelines, I cannot make a recommendation unless specifically ordered to do so [by the family court]." However, the report stated the guardian was prepared and willing to make a recommendation if so asked. Importantly, neither party disputed the contents or veracity of the GAL's report in any way.

The guardian then testified in person, again without objection. She stated her interactions with the children were markedly different depending on the location in which she talked to them. For example, at Father's house, the children were "very relaxed," "welcomed [the guardian] with open arms," and "wanted [her] to sit down and talk and look at picture books of things they had done [with Father]." In contrast, the guardian observed the children "were much more uptight at [M]other's," asking the guardian to "talk low" or wait until Mother turned on the vacuum so that she (Mother) could not overhear them. Similarly, when the guardian texted the children asking to talk to them on the phone, their responses would be different depending on where they were: at Father's house, the children would say "yes, I'm at dad's"; whereas at Mother's house, the children would say "no, I'm at mom's, can't talk." The guardian concluded by emphasizing the children's feelings regarding the custody dispute, stating they "had wanted [the guardian] to know very much that they love mom and dad both and that they really just don't want to -- you know, they don't want to be torn between the situation."

At the conclusion of the guardian's testimony, the family court indicated its intent to ask the guardian for her recommendation on custody, explaining it believed the recommendation would be helpful because of the disparity in the testimony from Mother and Father, and because neither party presented any "middle ground" with respect to future custody arrangements. The family court noted that it could "accept th[e guardian's] recommendation or decline that recommendation, but [it] just

want[ed] to have that recommendation as part of [its] considerations in this case." Neither party objected to the family court requesting the guardian's custody recommendation. The guardian then opined it would be in the children's best interests to award Father primary custody.

**E.**

In its final order, the family court noted all of the witnesses for both Mother and Father agreed the children were "exceptional children" and "excellent students," specifically describing them as "smart, . . . well-mannered, respectful, trustworthy, well-rounded, [and] well-adjusted with wonderful, happy personalities." As a result, the family court found there could be "absolutely no . . . doubt of the credibility of these children." The family court then extensively detailed the testimony from all of the witnesses, finding the testimony presented by Father and the guardian more credible than Mother's testimony. The family court again noted its reasoning for requesting the guardian's custody recommendation, stating the recommendation was helpful "[b]ecause of the otherwise disparate testimony, and because this guardian had spent considerable time with these children and had developed a positive mutual rapport with them." Ultimately, the family court found Father had shown a substantial change in circumstances warranting a change in custody and that such change was in the children's best interests. Accordingly, the family court awarded primary custody to Father.

**F.**

Mother appealed, arguing that the family court unduly relied upon the guardian's report and testimony, and that the totality of the evidence supported awarding her primary custody. Agreeing with Mother in part, the court of appeals reversed the family court's decision but, rather than granting Mother primary custody, reinstated the joint custody arrangement. *Grungo-Smith v. Grungo*, 438 S.C. 508, 884 S.E.2d 219 (Ct. App. 2023). In relevant part, the court of appeals held Father had not established a substantial change in circumstances, citing (1) Father's admitted failure to exercise his right to fifty percent of the children's time under the divorce decree; (2) the children's academic and social success under Mother's predominant care; and (3) the view that each of Mother's six moves was in the best interest of the children because Mother testified her moves were into larger homes or to be closer to the children's current school.

Curiously, the court of appeals disregarded any of the evidence or testimony presented by the guardian, explaining it was "concern[ed] with the family court requesting a recommendation from the Guardian because *it should have only*

*requested a recommendation in extraordinary circumstances*, which were not present in this case." (Emphasis added). The court of appeals concluded that the remaining evidence—excluding that presented by the guardian—showed both parents factored into the children's success. Accordingly, the court of appeals held both parties failed to demonstrate a substantial change in circumstances or that the best interests of the children would be served by a change in custody. The court of appeals therefore reversed the family court's decision and reinstated the joint custody arrangement set forth in the 2012 divorce decree.

Father sought a petition for a writ of certiorari, asserting the court of appeals erred in (1) inserting an "extraordinary circumstances" requirement into the law governing the role and duties of a guardian ad litem; and (2) incorrectly and selectively assigning weight to portions of Mother's evidence while ignoring indisputably unfavorable evidence associated with Mother's conduct and the negative impact of Mother's second and third husbands on the children. We granted Father's petition to review the decision of the court of appeals.[3]

## II.

"In appeals from the family court, this Court reviews factual and legal issues de novo." *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011). Nonetheless, "The highly fact-intensive nature of family court matters lends itself to a respect for the factual findings of our able and experienced family court judges who are in a superior position to assess the demeanor and credibility of witnesses." *Lewis v. Lewis*, 392 S.C. 381, 390–92, 709 S.E.2d 650, 654–55 (2011) (noting that while the appellate courts may make their own findings of fact in family court cases, there is typically "a preference to sustain a family court's factual findings" in recognition of "the superior position of the family court judge in making credibility determinations"); *see also Woodall v. Woodall*, 322 S.C. 7, 10, 471 S.E.2d 154, 157 (1996) ("[T]he appellate court should be reluctant to substitute its own evaluation of the evidence on child custody for that of the trial court.").

## III.

Section 63-3-830 of the South Carolina Code (2010) sets forth the duties of a private guardian ad litem. As is relevant here, the statute provides that the guardian's "final written report must not include a recommendation concerning which party should be

---

[3] Mother did not cross-petition in an effort to continue to seek primary custody of the children or an order for child support from Father.

awarded custody, nor may the guardian ad litem make a recommendation as to the issue of custody at the merits hearing *unless requested by the court for reasons specifically set forth on the record*." S.C. Code Ann. § 63-3-830(A)(6) (emphasis added); *see also, e.g.*, *Patel v. Patel*, 347 S.C. 281, 285, 555 S.E.2d 386, 388 (2001) (stating that in custody cases, the family court will consider a number of factors in determining the best interest of the child, including the opinions of third parties such as the guardian ad litem and the child).

There is no basis upon which to read an "extraordinary circumstances" requirement into section 63-3-830(A)(6).[4] The legislature did not include these words in the statute either expressly or by implication. Rather, the plain language of the statute requires only that a guardian not make an unprompted custody recommendation; however, a guardian is explicitly permitted to make a recommendation if "requested by the court for reasons specifically set forth on the record." S.C. Code Ann. § 63-3-830(A)(6); *see also Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("Under the plain meaning rule, it is not the court's place to change the meaning of a clear and unambiguous statute. Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning." (cleaned up)).

Here, the guardian did not make a custody recommendation in either her report or her initial testimony; she only did so after the family court requested she make a recommendation. Further, the family court justified that request on the record, explaining that the guardian's recommendation "would be helpful because of the disparity in the testimony, and [n]either side present[ed] any middle ground to the Court [since both parents requested primary custody]." The family court likewise explained it could accept or reject the guardian's recommendation, and it would merely use the recommendation as one more piece of evidence to consider in making

---

[4] We note neither party advocated for this reading of section 63-3-830(A)(6) at any point before the family court or the court of appeals. Rather, the court of appeals erroneously took it upon itself to enlarge Mother's issue on appeal—whether the family court overly relied on the guardian's testimony and report—to encompass this question. *See Duke Energy Carolinas, L.L.C. v. S.C. Off. of Regul. Staff*, 434 S.C. 392, 419 n.21, 864 S.E.2d 873, 887 n.21 (2021) ("While the Court may affirm a lower court's decision on any basis appearing in the record, it may not similarly reverse a decision unless the particular grounds for reversal have been raised by the parties." (citing Rule 220(c), SCACR)).

its custody determination.

The procedures followed by the family court and the guardian precisely tracked the express dictates of section 63-3-830(A)(6). No "extraordinary circumstances" were required. The court of appeals erred in inserting such a requirement into the statute.

**IV.**

We next turn to whether the court of appeals additionally erred in holding the family court's finding of a change in circumstances was unsupported by the record.[5]

In cases involving child custody, the controlling factor is the best interest of the child. *Patel*, 347 S.C. at 285, 555 S.E.2d at 388.

> The family court considers several factors in determining the best interest of the child, including: who has been the primary caretaker; the conduct, attributes, and fitness of the parents; the opinions of third parties (including GAL, expert witnesses, and the children); and the age, health, and sex of the children.

*Id.* "[T]here exist no hard and fast rules [for determining when to change custody,] and the totality of circumstances peculiar to each case constitutes the only scale upon which the ultimate decision can be weighed." *Davenport v. Davenport*, 265 S.C. 524, 527, 220 S.E.2d 228, 230 (1975); *Scott v. Scott*, 354 S.C. 118, 124–25, 579 S.E.2d 620, 623 (2003).

The party seeking to alter a prior custody agreement has the burden of establishing a substantial change in circumstances subsequent to the entry of divorce that affects the child's welfare. *Latimer v. Farmer*, 360 S.C. 375, 381, 602 S.E.2d 32, 35 (2004); *Pinckney v. Hudson*, 294 S.C. 332, 333, 364 S.E.2d 462, 462 (1988). "A change in circumstances justifying a change in the custody of a child simply means that sufficient facts have been shown to warrant the conclusion that the best interests of

---

[5] Unlike the court of appeals, in resolving this issue, we will consider *all* of the evidence presented to the family court, including that of the guardian. As explained above, the court of appeals erred in inserting an "extraordinary circumstances" requirement into section 63-3-830(A)(6), which led to it improperly rejecting the guardian's evidence in its review of the change-in-circumstances issue. Given that neither party has alleged the guardian's report or testimony is inaccurate or biased in any way, and the express dictates of the statute were followed here, we find it proper to consider the guardian's evidence in conjunction with the remaining evidence.

the child[] would be served by the change." *Stutz v. Funderburk*, 272 S.C. 273, 278, 252 S.E.2d 32, 34 (1979) (emphasizing the change in circumstance must be one that affects the best interests of the child, not merely the wishes or convenience of the parties (citation omitted)).

Father and Mother both sought to modify the custody agreement set forth in the 2012 divorce decree, and they therefore both initially bore the burden before the family court to establish a substantial change in circumstances that affected the best interests of the children. *See Latimer*, 360 S.C. at 381, 602 S.E.2d at 35; *Pinckney*, 294 S.C. at 333, 364 S.E.2d at 462. The family court found Father satisfied that burden and Mother did not.

While we have reviewed the evidence de novo, we are mindful of the family court's factual findings and the court of appeals' contrary findings. We readily agree with the family court and the court of appeals that Mother failed to establish a substantial change of circumstances that would warrant awarding her primary custody. Moreover, Mother has not demonstrated any error in the family court's factual findings, most importantly, those involving credibility determinations. *See Lewis*, 392 S.C. at 385, 391–92, 709 S.E.2d at 652, 655. In fact, our de novo review firmly convinces us of the correctness of the family court's conclusions that Father established a substantial change in circumstances, and the best interests of the children are served by awarding primary custody to Father.

Our decision should in no manner be read to criticize either parent, for it is clear they both deeply care for the children, and the children love them both in return. Nonetheless, it must be noted that, as alluded to above, Mother's second husband committed (and was convicted of) a heinous crime against one of the children, and Mother's third husband verbally abused both children with apparent impunity. *See Shirley v. Shirley*, 342 S.C. 324, 342, 536 S.E.2d 427, 436 (Ct. App. 2000) (looking for a "continuing pattern" of poor choices when evaluating the effect of a parent's behavior on the best interests of the child). Moreover, Mother and Smith's verbal altercations caused considerable tension with and distress to the children while at Mother's house. Equally concerning, Mother and Smith apparently belittled Father to the children, calling him offensive and inappropriate names. *Cf. Scott*, 354 S.C. at 126–27, 579 S.E.2d at 624 (stating it is not in the best interests of the child for one parent to alienate the child from the other by denigrating them in front of the child (citing *Sanders v. Sanders*, 232 S.C. 625, 103 S.E.2d 281 (1958))). In contrast to the discordant atmosphere at Mother's house, the children were, by all accounts, objectively and noticeably more comfortable at Father's house.

It is equally significant Father demonstrated considerable maturity and stability during the tenure of the joint custody arrangement. While Mother and the court of appeals faulted Father for failing to exercise his full right to custody under the joint custody arrangement, it is clear his reason for doing so was because he was putting the children's interests before his own.[6] Father's decision under the circumstances to let the children sleep at Mother's house on school nights rather than strictly enforcing the joint custody agreement reflects favorably upon him.[7]

For all of these reasons, we hold the family court correctly found Father established a substantial change in circumstances warranting a change in custody, and the best interests of the children would be served by awarding Father primary custody.

## V.

Child custody disputes are fraught with emotion and difficulty, not the least of which is that the parties often present conflicting testimony. By statute, a guardian ad litem is one tool the family court may use to help it discern what custody arrangement would be in the best interests of the child. Section 63-3-830(A)(6) allows the family court to exercise its discretion as to whether to elicit the guardian's custody recommendation, with no requirement that discretion be exercised only in "extraordinary circumstances." The family court precisely followed the statute here and, in doing so, found Father had established a substantial change in circumstances warranting a change in the prior custody arrangements and the best interests of the children would be served by granting him primary custody. We find the family court's decision manifestly supported in the record and in accord with our de novo review. Accordingly, we reverse the court of appeals' decision and reinstate the family court's custody order in full.

---

[6] More specifically, Father worried that if he kept the children overnight on a school night, they would not get enough sleep or not get to school (over an hour away from Father's home) on time. Once the pandemic began, Father's worries became moot—the children were able to attend school remotely from either parent's house—and he then exercised his full right to custody under the divorce decree.

[7] In a similar vein, Father subsumed his own legal rights to his children's peace of mind, opting not to take Mother to court over violations of the divorce decree (such as them having to agree on the children's school) in order to "eliminate stress from the children." This too reflects favorably upon Father's fitness to be the primary custodial parent.

**REVERSED.**

**FEW, JAMES, HILL and VERDIN, JJ., concur.**