734 S.E.2d 322

**Padgett S. LEWIS, Respondent,**

v.

**Brian Randolph LEWIS, Appellant.**

**Appellate Case No. 2010–173166.**

**No. 5050.**

Court of Appeals of South Carolina.

Heard Sept. 11, 2012.

Decided Nov. 14, 2012.

Thomas M. Neal, III, of Law Offices of Thomas M. Neal, III, of Columbia, for Appellant.

Carrie A. Warner, of Warner, Payne & Black, of Columbia, for Respondent.

HUFF, J.

Brian Randolph Lewis (Husband) appeals the order of the family court, asserting the court erred in (1) awarding child support to Padgett S. Lewis (Wife) based upon an imputed monthly income to him of $2,900.00, (2) failing to award the parties joint custody of their minor child or, alternatively, failing to award Husband more than standard visitation, (3) finding Husband's therapy counselor was unaware of certain matters involving Husband, and (4) requiring each party to pay his or her own attorney's fees. We affirm in part and reverse and remand in part.

## FACTUAL/PROCEDURAL HISTORY

Husband and Wife were married on September 2, 2001, and have one child from the marriage (Son), who was born on April 27, 2004. The parties separated on October 29, 2006, following an incident between the two, wherein both alleged a physical assault by the other. Wife left the marital residence with Son at that time, and filed a complaint and motion for pendente lite relief on an expedited basis on October 31, 2006. Following a November hearing, the court issued a temporary order on December 14, 2006, granting Wife custody of Son and ordering Husband to pay $1,024 a month in child support, based upon the child support guidelines and submitted financial declarations. The court further ordered that, upon Husband providing a letter from his counselor, Dr. Samer Touma, Husband was entitled to visitation every other weekend from Friday until Sunday, two hours on Wednesdays during weeks he did not have overnight visitation, and for a three day period during the Christmas holidays that year. On March 7, 2008, the court subsequently modified Husband's visitation, extending the weekend visitation until Monday morning and providing for visitation during the Thanksgiving and Christmas holidays, as well as during spring break, Easter, and the summer months. On April 11, 2008, Husband filed a motion for pendente lite relief, alleging he became unemployed on April 2, 2008, and seeking a decrease in his child support payments. The family court issued an order on May 15, 2008, denying Husband's request, but allowing Husband to use his equity in the marital home as an advance against his share of equitable distribution for purposes of fulfilling his obligation. On September 24, 2008, Husband filed a motion, on an expedited basis, to require a psychological evaluation of the parties for use in determining the best interests of Son in regard to the custody issue. On October 17, 2008 the family court granted this motion, appointing a clinical psychologist, Dr. Marc Harari, to conduct the psychological evaluations.

The case was heard by the family court over a period of three days in November 2008, and February and March 2009. By order dated July 10, 2009, the family court issued a final decree of divorce in the matter, finding Wife entitled to a divorce on the ground of one year of continuous separation of the parties. The court denied Husband's request for joint

custody, finding this case was not appropriate for same. The court granted Wife's request and denied Husband's for primary custody, finding it in Son's best interest to remain with Wife. The court further granted Husband visitation every other weekend from Friday evening until Monday morning, Mondays following non-visitation weekends from 5:00 p.m. to 7:30 p.m., and ordered a split schedule between the parties for Thanksgiving, Christmas, spring break and Easter, to be followed on a yearly rotating basis between the parties. Husband also received four non-consecutive weeks of visitation during the summer. Additionally, the family court found Husband was unemployed at that time, but imputed an income to him of $2,900.00 a month, or $34,800.00 annually, and ordered Husband to pay $125.00 a week in child support based upon the child support guidelines. The family court further reserved the right to review Husband's child support obligation upon him securing employment. The court held the issue of attorney's fees and costs in abeyance, pending counsels' arguments on the matter and the court's review of settlement negotiations.

Husband filed a motion to reconsider, challenging the court's final decree in several aspects, including the family court's failure to grant him joint custody, or alternatively, increased visitation, failure to consider the full testimony of Dr. Touma based upon a finding Dr. Touma was unaware of certain matters, and imputation of a monthly income of $2,900.00 to him. Following a hearing on the matter, the family court partially granted Husband's motion, modifying certain aspects of its order not in issue on appeal, but declining to do so in the above matters. Thereafter, the family court considered written argument of both parties, and declined to award attorney fees to either, finding Husband and Wife were responsible for their respective attorney's fees.

**ISSUES**

1. Whether the family court erred in awarding child support based upon an imputed gross monthly income to Husband of $2,900.00 because there was insufficient evidence to support this amount.

2. Whether the family court erred in failing to award the parties joint custody of Son or, in the alternative, to award Husband additional visitation with Son.

3. Whether the family court erred in finding Dr. Samer Touma was unaware of certain issues regarding Husband, because the clear and uncontradicted testimony of Dr. Touma was that he was aware of the issues.

4. Whether the family court erred in requiring each party to pay his or her own attorney's fees, because the evidence shows Wife should be required to contribute to Husband's attorney's fees.

## STANDARD OF REVIEW

In appeals from the family court, an appellate court reviews factual and legal issues de novo. *Simmons v. Simmons,* 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011). "De novo review permits appellate court fact-finding, notwithstanding the presence of evidence supporting the trial court's findings." *Lewis v. Lewis,* 392 S.C. 381, 390, 709 S.E.2d 650, 654–55 (2011). However, while this court has the authority to find facts in accordance with its own view of the preponderance of the evidence, "we recognize the superior position of the family court judge in making credibility determinations." *Id.* at 392, 709 S.E.2d at 655. Further, de novo review does not relieve an appellant of his burden to "demonstrate error in the family court's findings of fact." *Id.* "Consequently, the family court's factual findings will be affirmed unless appellant satisfies this court that the preponderance of the evidence is against the finding of the [family] court." *Id.* (alteration in original) (internal citation and quotation marks omitted).

## LAW/ANALYSIS

### A. Imputed Income

Husband first contends the family court erred and abused its discretion in awarding child support based upon an imputed gross monthly income of $2,900.00, because there was insufficient evidence to support the imputation of income and the corresponding child support award. We agree.

Our law is clear that, in determining child support or alimony obligations, the family court has the discretion to

impute income to a party who is voluntarily unemployed or underemployed.

> If the obligor spouse has the ability to earn more income than he is in fact earning, the court may impute income according to what he could earn by using his or her best efforts to gain employment equal to his capabilities, and an award of [support] based on such imputation may be a proper exercise of discretion even if it exhausts the obligor spouse's actual income.

*Dixon v. Dixon*, 334 S.C. 222, 240, 512 S.E.2d 539, 548 (Ct.App.1999) (internal citation and quotation marks omitted); *see also Patel v. Patel*, 359 S.C. 515, 532, 599 S.E.2d 114, 123 (2004) (*Patel II* ); *Blackwell v. Fulgum*, 375 S.C. 337, 347, 652 S.E.2d 427, 432 (Ct.App.2007) (noting it is appropriate to impute income to a party who is voluntarily unemployed or underemployed when determining child support obligations). "Whether termed voluntary underemployment, imputation of income, or the failure to reach earning potential, the case law is clear that when a payor spouse seeks to reduce support obligations based on his diminished income, a court should consider the payor spouse's earning capacity." *Marchant v. Marchant*, 390 S.C. 1, 9, 699 S.E.2d 708, 712 (Ct.App.2010) (quoting *Gartside v. Gartside*, 383 S.C. 35, 44, 677 S.E.2d 621, 626 (Ct.App.2009)).

In *Sanderson v. Sanderson*, 391 S.C. 249, 253–54, 705 S.E.2d 65, 66–67 (Ct.App.2010), this court addressed a similar situation wherein the family court had imputed an annual income of $64,000 to the husband after he lost his position earning $95,000, as a result of corporate downsizing. There, we noted the South Carolina Child Support Guidelines specifically provide that "[i]n order to impute income to a parent who is unemployed or underemployed, the court should determine the employment potential and probable earnings level of the parent based on that parent's recent work history, occupational qualifications, and prevailing job opportunities and earning levels in the community." *Id.* at 256, 705 S.E.2d at 68; S.C.Code Ann. Regs. 114–4720(A)(5)(B) (Supp.2011). We further acknowledged in *Sanderson*, while a bad faith motivation is not required for a finding of voluntary underemployment, "the motivation behind any purported reduction in income or earning capacity should be considered in determining whether

a parent is voluntarily underemployed." *Id.* Additionally, "[w]hen actual income versus earning capacity is at issue, courts should closely examine a good-faith and reasonable explanation for the decreased income." *Id.* After noting there was no dispute that the husband lost his job through no fault of his own, this court then went on to review the evidence of record as related to the factors set forth in the guidelines and determined the family court abused its discretion in imputing an annual income of $64,000 to Husband, and that remand of the matter to the family court was proper to calculate Husband's income based upon the evidence of record. *Id.* at 256–58, 705 S.E.2d at 68–69.

In regard to child support, the court's final order provides in pertinent part as follows:

> [Husband] is currently unemployed. Based upon his work history and income, this Court imputes a gross monthly income to [Husband] of $2,900.00, or $34,800.00 annually. [Wife] is currently employed and earns a gross monthly income of $6,669.00 per month.
>
> [Wife] pays $125.00 per month toward the child health and dental insurance through her employer and $518.00 per month in daycare expenses. Based upon the Child Support Guidelines, [Husband] shall pay [Wife] One Hundred Twenty–Five and No/100 Dollars ($125.00) per week in child support.... This court specifically reserves the right to review [Husband's] child support obligation upon his securing employment of which [Husband] shall notify [Wife] within 48 hours.

The family court made no finding whatsoever as to whether Husband was at fault in losing his job, whether he was voluntarily unemployed, or whether he put forth his best efforts to gain employment equal to his capabilities. More importantly, it failed to address the necessary factors delineated by the child support guidelines concerning recent work history, occupational qualifications, prevailing job opportunities and earning levels in the community. Additionally, there is nothing in the record to suggest how the family court arrived at the annual income figure of $34,800 to be imputed to Husband. Further, the family court specifically acknowledged at the hearing on Husband's motion for reconsideration

that it did not remember why it arrived at that figure. The family court failed to address the factors required by the guidelines, and we simply cannot find evidence in the record before us to support the court's imputation figure of $34,800. Therefore, after de novo review, we remand the imputation of income to the family court pursuant to *Sanderson* for reconsideration based upon the factors set forth in the Child Support Guidelines.[1]

## B.  Custody and Visitation

Husband next contends the family court erred in failing to award the parties joint custody over Son or, alternatively, failing to award him additional visitation with Son. He argues joint custody is generally awarded in exceptional circumstances, and such circumstances exist in this case. He maintains the actions of Wife show the only way he will have any meaningful time with Son is through a specific court order, as Wife would not permit visitation outside the court order. Husband contends, because he and Wife do not communicate well, joint custody would be healthiest, as it keeps the child from developing a negative perception of the non-custodial parent. In the alternative, Husband argues that should this court believe joint custody is not appropriate, he should be allowed more than the standard visitation awarded by the family court.

In making a custody determination, the child's welfare and best interest are the paramount and controlling considerations of the court. *Patel II,* 359 S.C. at 526, 599 S.E.2d at 119. As with determinations of child custody, the welfare and best interests of the child are the primary considerations in determining visitation. *Paparella v. Paparella,* 340 S.C. 186, 191, 531 S.E.2d 297, 300 (Ct.App.2000). In determining the best interests of the child, the family court considers several factors "including: who has been the primary caretaker; the conduct, attributes, and fitness of the parents; the opinions of third parties (including GAL, expert witnesses, and the children); and the age, health, and sex of the children." *McComb v. Conard,* 394 S.C. 416, 422, 715

---

1.  Because we are remanding for reconsideration the issue of imputed income, upon establishing the imputed amount, the family court should also determine the matter of retroactivity.

S.E.2d 662, 665 (Ct.App.2011) (quoting *Patel v. Patel,* 347 S.C. 281, 285, 555 S.E.2d 386, 388 (2001) (*Patel I* )). "Although the legislature gives family court judges the authority to order joint or divided custody where the court finds it is in the best interests of the child, . . . joint or divided custody should only be awarded where there are exceptional circumstances." *Patel II,* 359 S.C. at 528, 599 S.E.2d at 121; S.C.Code Ann. § 63–3–530(A)(42) (2010) (internal citation and quotation marks omitted). "Absent exceptional circumstances, the law regards joint custody as typically harmful to the children and not in their best interests." *Spreeuw v. Barker,* 385 S.C. 45, 61, 682 S.E.2d 843, 851 (Ct.App.2009). In determining joint custody is usually considered harmful to and not conducive to the best interest and welfare of a child, our courts have explained the disfavor as follows:

> The courts generally endeavor to avoid dividing the custody of a child between contending parties, and are particularly reluctant to award the custody of a child in brief alternating periods between estranged and quarrelsome persons. Under the facts and circumstances of particular cases, it has been held improper to apportion the custody of a child between its parents, or between one of its parents and a third party, for ordinarily it is not conducive to the best interests and welfare of a child for it to be shifted and shuttled back and forth in alternate brief periods between contending parties, particularly during the school term. Furthermore, such an arrangement is likely to cause confusion, interfere with the proper training and discipline of the child, make the child the basis of many quarrels between its custodians, render its life unhappy and discontented, and prevent it from living a normal life.

*Scott v. Scott,* 354 S.C. 118, 125–26, 579 S.E.2d 620, 624 (2003) (quoting *Mixson v. Mixson,* 253 S.C. 436, 447, 171 S.E.2d 581, 586 (1969)).[2]

---

**2.** We note that in *Scott,* our supreme court concluded our legislative statute governing the family court's jurisdiction, which specifically grants the family court the exclusive jurisdiction "to order joint or divided custody where the court finds it is in the best interests of the child," currently codified in section 63–3–530(A)(42), does not change the law in this State that, generally, joint custody is disfavored. 354 S.C. at 125, 579 S.E.2d at 623–24.

██ After review of the record de novo, we find Husband has not met his burden of convincing us the family court's determination regarding custody and visitation is against the preponderance of the evidence.

As to joint custody, the record shows both Dr. Harari and Dr. Touma considered joint custody to be a more viable option when the parents can cooperate with each other. Specifically, Dr. Harari, who was qualified as an expert in counseling psychology, testified that based upon his evaluation of the parties, joint custody or shared custody would not be appropriate in this case because of the "immense disagreement between these parties." He noted, although both parents claimed they were trying to cooperate with the other, they had been through hours of unsuccessful mediation. Dr. Harari thus found "having them share in equal custody just doesn't seem realistic." He further concluded, within a reasonable degree of medical certainty, Wife presented in a more credible and realistic manner during the testing process. Further, although Dr. Harari acknowledged there was a potential for joint physical custody of Son due to the parties' geographic proximity, he was concerned with the communication problems between the parties. Dr. Harari clarified, however, he did not recommend joint legal custody, and though joint physical custody was potentially possible, the mistrust between the parties outweighed their geographic proximity. Finally, Dr. Harari expressed concern in regard to joint custody based upon Husband's response pattern on the administered psychological testing, which indicated there needed to be a higher degree of caution with Husband.[3] Dr. Touma, who was qualified as an expert in counseling and family therapy, testified

---

3. With regard to Husband, Dr. Harari found his response pattern on all four tests administered to show his "validity indices was considered socially desirable and overly favorable meaning it was not a realistic [portrayal] of his true functioning level," indicating he possibly presented only his most positive attributes. An alternative explanation was that Husband suffered from a personality disorder suggestive of someone with a high degree of narcissism, but Dr. Harari believed, based upon the data he received from Dr. Touma and other information, that it was more likely Husband responded over favorably and unrealistically. Dr. Harari noted in his report that Husband was reluctant to admit to common flaws that most individuals typically endorse, and determined Husband exhibited heightened levels of positive impression management defensiveness.

that the more time a child spends with both parents, the more the child's adjustment issues are reduced and it is therefore beneficial to the child. However, Dr. Touma also qualified this opinion, stating "it's best if the parents can get along and cooperate and find a way to work together." He further noted, based on recent research, the ideal situation involving divorce is for two parents to split time with the child, but stated "the most important component is no hostility or controversy between the parents," and if the parents can cooperate and collaborate, equal time is good for the child. Dr. Touma also agreed that Dr. Harari was in a better position than him to offer a custody recommendation or opinion to the court.

As noted, our courts generally disfavor joint custody since, ordinarily, it is not conducive to the best interest and welfare of a child to be shuttled back and forth in alternate brief periods between parents. Further, our courts are particularly reluctant to award joint custody between estranged and quarrelsome parents. Here, not only has Husband failed to show exceptional circumstances warranting an award of joint custody, the evidence of record supports the conclusion that joint custody in this case would not be in the best interest of Son given the acrimonious relationship between Husband and Wife.

As to extended visitation, we find no error in the amount of visitation the family court awarded Husband for the same reasons as noted above. Our review of the preponderance of the evidence convinces us that, given the lack of cooperation and communication between the parties, allowing Husband more extensive visitation would not be in Son's best interest.

In *Paparella*, relied upon by Husband, this court agreed with the father's assertion that he should have been awarded expanded visitation. 340 S.C. at 191, 531 S.E.2d at 300. There, the family court awarded father visitation with the children every other weekend, beginning on Friday at 6 p.m. and ending on Sunday at 6 p.m. *Id.* The mother admitted during trial that the father should be awarded more visitation than this. *Id.* Further, the record showed that the father was involved in raising his children and in their day-to-day activi-

ties, and that while the parties were married, they worked as pharmacists at the same drugstore and were able to arrange their schedules so that one parent was home with the children while the other parent was at work, thus eliminating the need for the children to be in daycare. *Id.* Based on these circumstances, this court agreed that the father should be allowed more visitation with the children, and modified the visitation schedule to provide the father visitation every other weekend during the school year, beginning after school on Friday and ending when they returned to school Monday morning, as well as on the Thursday preceding the weekend when the father did not have visitation, from after school until they returned to school Friday morning, and on the Tuesday following the weekend when he did not have visitation, from after school until they returned to school Wednesday morning. *Id.* at 191–92, 531 S.E.2d at 300. We also determined the father's summer visitation should be expanded to half of the children's summer vacation. *Id.* at 192, 531 S.E.2d at 300. In the case at hand, evidence of record shows Husband was not as involved in Son's life prior to the parties' separation.[4] Further, Husband's visitation was not as limited by the family court as was that of the father in *Paparella.* Finally, Wife did not agree during the trial that Husband should receive more visitation, as did the wife in *Paparella.*

Additionally, while Husband strenuously argues the importance of allowing joint custody or expanded visitation to insure the continued quality relationship between Husband and Son, we find no evidence in the record that Husband and Son's relationship is in jeopardy based upon the visitation awarded by the court. Further, as noted by the Guardian Ad Litem and the family court in the hearing on Husband's motion for reconsideration, Husband received fairly significant visitation from the court, with the court expanding his time somewhat from the previous temporary court order. Additionally, the court noted the testimony of the daycare provider concerning

---

4. Though Husband claimed the parties shared equally in caring for Son before the separation, Wife testified, as well as presented other witnesses, to the contrary. Given the problems with Husband's credibility, as noted below, we do not believe Husband has met his burden of convincing us by the preponderance of the evidence that he was involved with Son like the father was involved with raising his children in *Paparella.*

problems with Husband dropping child off at the appropriate time. Lastly, the court at this hearing noted that it had closely divided the summer by giving Husband four weeks of visitation. Accordingly, we find the preponderance of the evidence supports the family court's order concerning visitation.

In summary, the record before us does not reflect that the evidence is so clearly in Husband's favor to warrant a finding of an abuse of discretion by the family court, and Husband has failed to sustain his burden of convincing this court that the family court did not consider Son's welfare and best interest in its custody and visitation decision.

## C. Finding Regarding Dr. Touma

Husband next argues the family court erred in finding Dr. Touma was unaware of certain issues regarding Husband, because the uncontradicted evidence was clear that Dr. Touma was aware of these matters. Specifically, Husband argues that Wife attempted to make an issue of allegations that Husband had, in the past, punched a hole in a wall and torn up photographs, and the family court made a finding that Dr. Touma was unaware of these incidents. He argues, in spite of the fact that the court was presented with Dr. Touma's testimony during the motion for reconsideration that he was aware of the incidents and Husband took responsibility for them, the court declined to modify its finding in this regard.

At the final hearing, Wife testified to numerous instances of hostile or aggressive behavior by Husband, including the following: routinely mistreating and threatening Wife's dog; instances of throwing objects such as phones, remote controls, alarms, and camcorders; beating on and damaging a locked bedroom door, causing Husband to break his wrist; and punching a hole in the wall. Additionally, Wife testified that, after she purchased a package of pictures of Son for around $200, Husband asked to see the pictures and then proceeded to rip them into pieces in front of her and Son. Wife also testified Husband threatened to divorce her, and told her he would "break [her] mentally, financially and physically." Finally, Wife submitted into evidence a note written to her by

Husband during the marriage which stated, "I WISH YOU WOULD LEAVE!"

In response to Wife's allegation in her complaint that Husband beat the dog, Husband admitted in his answer that he did beat the dog, but "affirmatively assert[ed] that the dog required discipline." During his testimony, however, Husband denied that he beat the dog, claiming he only spanked the dog with Wife's permission, and asserted the admission in his answer was a "misstatement" by his attorney. Husband admitted he broke his wrist punching a hole in a bedroom door, and also admitted writing the note to Wife saying he wished she would leave. He further admitted tearing up the pictures of Son, stating he was disappointed and hurt because the parties had agreed on a less expensive package, and claimed he tore up the pictures "to prove a point." He likewise admitted putting his fist through a wall, explaining he was hurt and upset at things Wife had said to him during an incident with the dog. Yet, Husband repeatedly denied that he had a temper or that he was angry during the various incidents, and denied being abusive toward Wife. We find Husband's credibility is suspect.

During cross-examination, Dr. Touma testified Husband had indicated he did not anticipate the breakup with Wife, and it happened abruptly. When Wife's attorney asked, had Dr. Touma known Husband left Wife the note stating he wished she would leave some one and a half years prior to the separation, whether Dr. Touma would have delved into that more, Dr. Touma stated that, had he known that, he would have asked Husband why he would have written that note. When asked if he saw any evidence of temper with Husband, Dr. Touma replied, "Not that I can talk about." Counsel then showed Dr. Touma the photographs of Son that Husband had torn and asked if he would have delved into those issues deeper had he known, and Dr. Touma responded, "Well, well, yeah, and I did delve into the issues of anger and frustration because he was angry initially regarding what took place and how these things transpired." Dr. Touma stated Husband talked to him about losing his temper, and Husband mentioned "about punching the hole at one time." When asked if he found Husband tended to blame everybody but himself for what happened during the marriage, Dr. Touma stated Hus-

band did blame others, but he also "took responsibility for things such as ... punching the wall ... and all these things."

In its final order, under the section concerning the granting of a divorce, the family court made findings of fact regarding Husband's complaints with the dog, Dr. Touma's testimony, and Husband's dispute with the findings of Dr. Harari, before finding Wife was entitled to a divorce on the ground of one year of continuous separation. As to Dr. Touma, the court noted Dr. Touma testified he did not find Husband to have any anger problems, but had admitted he was unaware Husband punched holes in the wall, had torn up photographs of Son, or had written a note to Wife asking her to leave.

It is unclear from Dr. Touma's testimony whether he was actually made aware of the incident where Husband tore up the photographs of Son. It is clear, however, that Dr. Touma was made aware that Husband punched at least one hole in the wall and Husband "took responsibility for such things as ... punching the wall." However, the court only made this finding in relation to the divorce between the parties, and there is no indication it considered this in regard to any of the other matters. Further, though the finding was inaccurate as concerned Dr. Touma's awareness that Husband punched a hole in the wall, the record supports its finding concerning the note left for Wife, and is ambiguous as to the torn photographs. Additionally, based upon the record before us, we do not believe this finding by the court is any more damaging to Husband than the other evidence presented. Accordingly, we find any error in the court's determination concerning Dr. Touma's knowledge of Husband's behavior to be harmless. *See McCall v. Finley*, 294 S.C. 1, 4, 362 S.E.2d 26, 28 (Ct.App.1987) (noting our appellate courts recognize an overriding rule which says: "whatever doesn't make any difference, doesn't matter.").

## D. Attorney's Fees

Lastly, Husband contends the family court erred in requiring each party to pay his or her own attorney's fees, asserting the evidence supported a conclusion Wife should be required to contribute to Husband's fees. He argues the manner in which Wife chose to begin this action, requesting an expedited

hearing, created an atmosphere of fear and mistrust which permeated the case, prejudiced Husband, and required the filing and hearing of numerous motions. Husband asserts Wife prolonged this case. He also contends he ultimately received greater than normal contact with Son, despite Wife's efforts to limit and restrict Husband's time with him. Further, Husband notes he lost his job during the pendency of the case, while Wife remained gainfully employed. Based upon the factors to be considered in determining whether any attorney's fees should be awarded, Husband argues he was entitled to an award of fees. Additionally, Husband argues that, if this court disagrees with his argument that he is entitled to attorney's fees under the case law, should it reverse the family court on any issue in this matter, the issue of attorney's fees and costs should be remanded.

The decision to award attorney's fees is within the family court's sound discretion, and although appellate review of such an award is de novo, the appellant still has the burden of showing error in the family court's findings of fact. *Chisholm v. Chisholm*, 396 S.C. 507, 510, 722 S.E.2d 222, 223–24 (2012). In deciding whether to award attorney's fees and costs, the court should consider the following factors: (1) the ability of the party to pay the fees; (2) beneficial results obtained; (3) the financial conditions of the parties; and (4) the effect a fee award will have on the party's standard of living. *E.D.M. v. T.A.M.*, 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992). Though we would generally be inclined to determine an award of attorney's fees in accordance with the factors outlined in *E.D.M. v. T.A.M.*, where "the case before us presents an added dimension of an uncooperative spouse who hampers a final resolution of the issues in dispute, we will not reward an adversary spouse for such conduct." *Blackwell*, 375 at 346, 652 S.E.2d at 431. Further, when parties fail to cooperate and their behavior prolongs the proceedings, this is a basis for holding the parties responsible for their own attorney's fees. *Lewin v. Lewin*, 396 S.C. 349, 356, 721 S.E.2d 1, 4 (Ct.App.2011). "An adversary spouse should not be rewarded for such conduct." *Anderson v. Tolbert*, 322 S.C. 543, 549, 473 S.E.2d 456, 459 (Ct.App.1996).

Here, we note that at the time of trial, Husband had managed to pay a substantial portion of the attorney's fees he incurred with three separate attorneys. *See Patel II*, 359 S.C. at 533, 599 S.E.2d at 123 (finding Wife had not shown she was unable to pay her attorney's fees where Wife had paid a $35,000 portion of fees and expenses totaling more than $90,000). More importantly, our review of the record reflects that Husband was, if not primarily, at least equally to blame for the protracted litigation in this matter, and this failure to cooperate supports the family court's determination that each party should be responsible for his and her own attorney's fees. We find further support for this in the position taken by Husband during his motion for reconsideration, wherein his attorney stated, "I cannot imagine, when you apply the law to the financial circumstances of these parties, that there would be any other outcome other than they would each pay their own fees." Accordingly, we find no error in the denial of attorney's fees to Husband, even in light of our recommended remand on the issue concerning imputed income.

## CONCLUSION

Based on the foregoing, we reverse and remand the matter of imputed income to Husband and affirm the remaining issues.

**AFFIRMED IN PART and REVERSED AND REMANDED IN PART.**

THOMAS and GEATHERS, JJ., concur.