**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Julie Aldie, Appellant,

v.

Gregory Hampton Grossman, Respondent.

Appellate Case No. 2016-001505

---

Appeal From Greenville County
Michael S. Holt, Family Court Judge

---

Unpublished Opinion No. 2019-UP-080
Submitted November 1, 2018 – Filed February 13, 2019

---

**AFFIRMED**

---

Brian P. Johnson, of The Law Office of Brian P. Johnson, LLC, of Greenville, for Appellant.

Sidney Paul Mitchell, Jr., of Mitchell Ramseur, LLC, and J. Falkner Wilkes, both of Greenville, for Respondent.

---

**PER CURIAM:** Julie Aldie (Mother) appeals the family court's order finding there was a substantial change in circumstances that necessitated a change in the custody and placement of the parties' minor child (Child). Mother contends the family court erred by (1) making findings of fact that are without evidentiary support, (2) finding there was a substantial change in circumstances that necessitated a change in the

custody and placement of Child, and (3) finding it was in Child's best interest to modify a previous order granting Mother expanded visitation with Child. We affirm.

## I.      Family Court Findings

Mother contends the family court's factual findings are not supported by the record. We disagree.

DSS and SAFY Investigations

The family court found that Mother made five separate allegations ranging from physical abuse to sexual abuse against Father, all of which were unfounded. Mother contends this finding was based solely on Father's testimony because there is "no other analysis on how the [family] court found Mother was responsible." Mother maintains that there is no evidence regarding who made the reports. We disagree.

A review of the record indicates that Mother made several allegations against Father. First, Mother admitted that she made reports to both the Department of Social Services (DSS) and Specialized Alternatives for Families and Youth (SAFY). Mother stated that because she is a nurse she is a mandatory reporter for South Carolina and if she suspects or sees an injury she is mandated to report it, but stated that she was not the only one to report Father. Specifically, Mother admitted she reported that Father sexually abused Child, again, indicating that she was a "mandated reporter."[1] Mother admitted to making a report that Father was "harming" Child because Father placed Child in a shirt that was too small. When Mother was questioned about whether she was the person to report the shirt incident to DSS or SAFY, Mother responded, "That was just one complaint of many." Second, Father testified that Mother made reports to SAFY alleging Father slapped Child in the face. Additionally, Father testified that he was investigated by SAFY concerning a report Mother made alleging that he hit Child in the face with a frisbee.[2] Lastly, Father stated that there was a night when Child was "horse-playing" prior to

---

[1] Mother alleged that Child made the allegations of sexual abuse. Mother reported the alleged abuse to DSS. Child was eventually interviewed at the Julie Valentine Center, where Child revealed that the alleged abuse could have been a dream. As a result of this statement, the case was closed and the allegations were determined to be unfounded.

[2] Father explained that Child was inadvertently hit in the face with a frisbee while they were playing with it; however, Child was not injured or harmed. The investigation was closed, and the allegations were determined to be unfounded.

his bath time and received a carpet burn on his bottom. Due to Mother making two prior allegations of abuse against him, Father stated he emailed Mother to inform her of the incident so that she would not be alarmed. Subsequently, Father was again investigated by DSS for a report of child abuse concerning the carpet burn Child received while in his care. Thus, we find the record is replete with evidence indicating that Mother made several unfounded allegations against Father. *See Ashburn v. Rogers*, 420 S.C. 411, 416, 803 S.E.2d 469, 471 (Ct. App. 2017) ("[T]he appellant retains the burden to show that the family court's findings are not supported by the preponderance of the evidence; otherwise, the findings will be affirmed.").

Child's Therapy

The family court found that Mother interfered with Child's ability to receive therapy. Specifically, the family court found that Mother "frustrated" the therapy that Father attempted to obtain for Child. Mother contends that the family court did not give weight to the testimony of the Child's current therapist, who testified the specific therapy that Father had obtained was not appropriate for Child's situation. We disagree.

At the modification hearing, Irene Shockley, a case manager with the South Carolina Autism Society, testified that she coordinated services for Child to receive behavioral therapy also known as Applied Behavioral Analysis (ABA). In an effort to curtail the cost of the therapy, Child applied for a "waiver," which would enable Child to receive funding for ABA therapy for three years. Shockley noted that thousands of children were on the waiting list for a waiver. Shortly thereafter, Child began receiving services from a provider named Hope Reach.

Bethanie Welborn, an employee at Hope Reach, testified that during one of Child's therapy sessions, Child attempted to hit one of the therapists. According to the therapists, this was a new behavior that Child had exhibited. As a response to Child's actions, the therapist "prompted" Child's hands down and told him "no hitting." Mother was observing the therapy session and disagreed with the way the therapist handled Child. Father was also present during the session and did not have a problem with the therapist's actions. Subsequently, Mother accused the therapist of abusing Child.

After this session, Welborn scheduled a meeting with both parents and the therapists to discuss Child's actions and how to move forward with Child's treatment plan. However, Mother sent an email stating that she did not want to attend the meeting. Mother expressed that she was "uncomfortable being in the same room with [Father] and that she was uncomfortable with [Child's] escalating problem

behavior." As a result, Welborn decided to place Child's treatment on hold until she could alleviate Mother's concerns and get both parents on the same page. Welborn called Mother and Father to set up separate meetings; however, Mother indicated that she was uncomfortable meeting with her. Welborn successfully met with Father to discuss Child's treatment plan. However, Welborn ultimately decided that Hope Reach would no longer be able to offer services to Child because she believed the relationship with Mother was irreparable. Welborn explained that in order for Child to experience success in the program both parents needed to be on one accord. Welborn informed Father that Hope Reach would continue therapy with Child for a month on the days that Father had custody and requested that Father forward all communications with Hope Reach to Mother per their custody order. Additionally, Welborn testified that a majority of Child's sessions were spent addressing Mother's concerns. For example, during one of the sessions, Mother requested to be in the same room as Child. In an effort to accommodate Mother, Welborn tried to reserve a separate room for Child's session although this particular segment of his therapy would have occurred in a room with other children.

We find that Mother's uncooperative behavior interfered with Child receiving therapy that could have been beneficial to him. We find Mother's argument that Child's current therapist indicated ABA therapy was inappropriate is without merit. The fact that Child's current therapist stated the therapy would not be appropriate for Child's needs does not negate the fact that it was Mother's actions that caused the termination of Child's therapy. Furthermore, Father testified that Child has been terminated from four service providers and another provider threatened termination, all due to Mother's actions. Thus, the family court's finding is supported by the record. *See Ashburn*, 420 S.C. at 416, 803 S.E.2d at 471 ("[T]he appellant retains the burden to show that the family court's findings are not supported by the preponderance of the evidence; otherwise, the findings will be affirmed.").

Difficulty Co-Parenting

The family court found Mother was the primary reason the parties had difficulty co-parenting and that Mother was the least capable of making decisions concerning Child. Mother contends that the family court did not give weight to her examples demonstrating how Father made co-parenting difficult. We disagree.

The family court's order referenced several examples of how Mother's behavior created problems between the parties. For instance, witnesses testified during one of Child's therapy sessions, Mother caused a scene, crying and requesting to be placed in a separate room away from Father. The family court noted this in its

order.  Additionally, in the Arbitrated Order[3], the parties were instructed to select a form of electronic communication, such as Family Wizard, but ultimately indicated the parties could mutually agree on what they used.  Father testified that he covered the cost for both parties to use Family Wizard; however, Mother refused to use the program.  Father attempted to use Google calendar on the parties' cellular phones; however, Mother refused to use that form of communication as well.  Mother explained that she refused because she is not "tech savvy" and preferred email or text messaging.  Once again the family court noted this in its order.

Additionally, we find that based upon our view of the evidence, Mother has exhibited an inability to effectively communicate and cooperate with Father in the co-parenting of Child.  For example, when Father enrolled Child into extracurricular activities, there were instances when Mother refused to bring Child to his games, practices, or award ceremonies.  When Father tried to obtain a passport for Child, Mother was uncooperative in signing the passport.  Lastly, when Father was informed Child needed a computer, Father provided Child with an old work computer.  However, Mother subsequently called Father's employer inquiring if the computer was stolen, which resulted in Father being interrogated by his supervisor.  Ultimately, the issue was resolved and it was determined that the computer legally belonged to Father.  Thus, we share the family court's sentiment that mother is "more concerned with damaging Father at any cost so that she may obtain custody."  Therefore, we find the record supports the family court's finding.  *See Stoney v. Stoney*, 422 S.C. 593, 596, 813 S.E.2d 486, 487 (2018) ("[T]he proper standard of review in family court matters is de novo . . . ."); *Lewis v. Lewis*, 392 S.C. 381, 390, 709 S.E.2d 650, 654–55 (2011) ("*De novo* review permits appellate court fact-finding, notwithstanding the presence of evidence supporting the trial court's finding."); *see also Ashburn*, 420 S.C. at 416, 803 S.E.2d at 471 ("[T]he appellant retains the burden to show that the family court's findings are not supported by the preponderance of the evidence; otherwise, the findings will be affirmed.").

Relationship with Babysitter

Lastly, the family court found Mother was responsible for disrupting Child's relationship with his babysitter.  Specifically, Mother caused a scene in the presence of Child at Child's school when Father's babysitter tried to pick up Child.  Babysitter testified that Mother would not let Child get into her car and that Mother was yelling

---

[3] In May 2012, Mother and Father litigated the issue of custody through binding arbitration, which was incorporated into a final order—herein referenced as the Arbitrated Order.

in the presence of Child. This commotion caused Child to become upset, and he began clinging to Mother, crying and stating that he did not want to leave with the babysitter. This incident caused Father to leave work in order to resolve the issue with the school principal, and ultimately, Child left with Father's babysitter. The babysitter testified that Child's behavior that day was unusual because Child was typically eager to leave with her after school and enjoyed discussing his day with her. We find this testimony reflects the detrimental effect Mother had on Child's relationship with his babysitter, and therefore, the family court's finding is supported by the record. *See Ashburn*, 420 S.C. at 416, 803 S.E.2d at 471 ("[T]he appellant retains the burden to show that the family court's findings are not supported by the preponderance of the evidence; otherwise, the findings will be affirmed."). Furthermore, as to Mother's arguments that the family court failed to weigh certain evidence, we note "[t]he weight to be given evidence lies within the province of the fact finder, here the family court." *Bailey v. Bailey*, 293 S.C. 451, 453, 361 S.E.2d 348, 350 (Ct. App. 1987). "Considering the fact that the [family court] was in a better position to weigh the evidence, we defer to [its] judgment." *Id.*; *see also McComb v. Conard,* 394 S.C. 416, 422, 715 S.E.2d 662, 664–65 (Ct. App. 2011) ("The appellate court generally defers to the factual findings of the family court regarding credibility because the family court is in a better position to observe the witness and his or her demeanor.").

## II.     Change in Circumstances

Mother argues the family court erred because the modification order contains limited findings addressing how Child's welfare was negatively affected. Additionally, Mother maintains that the Arbitrated Order indicated that if Mother failed to continue therapy or was unable to control her anger in the presence of child, this behavior would constitute a "material change." Mother contends that the family court failed to reference this provision in the Arbitrated Order and that she has maintained therapy. We disagree.

When a court has previously established a visitation schedule, "the moving party must show a change of circumstances to warrant a change of visitation." *Ingold v. Ingold*, 304 S.C. 316, 320, 404 S.E.2d 35, 37 (Ct. App. 1991); *see also King v. Gardner*, 274 S.C. 493, 495, 265 S.E.2d 260, 262 (1980) ("[A] judicial award of the custody of a child and the fixing of visitation rights is not final and changed circumstances may authorize the change of custody or visitation rights in the future." (quoting *McGregor v. McGregor*, 255 S.C. 179, 183, 177 S.E.2d 599, 600–01 (1970))). Similar to changes of custody, modification of visitation must be in the best interests of the child. *See Paparella v. Paparella*, 340 S.C. 186, 191, 531 S.E.2d 297, 300 (Ct. App. 2000) ("As with child custody, the welfare and best interests of

the child are the primary considerations in determining visitation."). A change in circumstances justifying a reduction in visitation must adversely affect the welfare of the child. *See Ingold*, 304 S.C. at 320, 404 S.E.2d at 37 (finding an insufficient change of circumstances to justify reducing father's visitation because the mother had not shown how the visitation adversely affected their child's welfare); *Duck v. Jenkins*, 297 S.C. 136, 139, 375 S.E.2d 178, 179 (Ct. App. 1988) (stating visitation privileges can be denied when "their exercise would injure the child emotionally"). Lastly, it is not in a child's best interest to grant expanded visitation to a non-custodial parent when the child's parents lack cooperation and communication. *See Lewis v. Lewis*, 400 S.C. 354, 367, 734 S.E.2d 322, 329 (Ct. App. 2012) ("Our review of the preponderance of the evidence convinces us that, given the lack of cooperation and communication between the parties, allowing [the father] more extensive visitation would not be in [the child's] best interest.").

Under the Arbitrated Order, Mother and Father operated on a 2-2-3 schedule, meaning Child was with Mother on Mondays and Tuesdays, with Father on Wednesdays and Thursdays, and with Mother on Fridays, Saturdays, and Sundays. The schedule would then rotate accordingly. The family court reduced Mother's expanded visitation to a standard visitation schedule resulting in Mother having alternate weekends with Child. The family court found that Child's welfare was negatively affected by Mother's conduct. Specifically, the family court found that due to Mother's inability to cooperate with Child's therapists, Child was denied therapy services that could have benefitted him. As discussed in section I, the record support's this finding and the finding that Mother's conduct was detrimental to the welfare of Child.

Second, the family court found that Child's welfare was adversely affected because of Mother's inability to co-parent under the current visitation schedule. The family court noted that Mother was difficult to communicate with. Several witnesses, such as Child's therapists and counselors, members of SAFY, and Father, testified that communication with Mother was exhausting, hostile, and to no avail. Additionally, an employee at Hope Reach testified that Hope Reach had 192 emails concerning Child's case alone, in comparison to only receiving a total of forty emails from other parents during that same time period. In another instance, Mother was uncooperative with a SAFY investigation. A case manager at SAFY, Brenda Mansel, testified that she received a report that Child had a scratch on his face. She attempted to investigate the matter. The meeting with Father was successful; however, when Mansel arrived at Mother's home for their scheduled meeting, she could not contact Mother. Mansel stated that when she returned to her office the next day, she was informed that Mother filed a complaint against her, alleging that

she failed to appear for their scheduled meeting. Mansel called Mother to inform her that she was in fact at Mother's home as scheduled. Mansell informed Mother that she still wanted to arrange a meeting with her; however, Mother stated that she did not have confidence in their program and did not want Mansel to come to her home. Mansel explained to the court that Mother seemed very agitated on the phone, was talking over Mansel while Mansel was trying to explain herself, and was not cooperative in trying to communicate with Mansel. Lastly, Father testified that communication with Mother was difficult. Father and Mother agreed to use email as their preferred method of communication. Father stated that attempts to solve simple issues turned into "exhausting email sessions," explaining that if he emailed Mother trying to resolve simple issues, it would result in thirty-one emails being conveyed just to discuss something, but without the issues being resolved. Thus, we find that Mother's inability to effectively and cordially communicate with the persons involved in Child's life adversely effected the welfare of Child. *See Lewis*, 400 S.C. at 367, 734 S.E.2d at 329 ("Our review of the preponderance of the evidence convinces us that, given the lack of cooperation and communication between the parties, allowing [the father] more extensive visitation would not be in [the child's] best interest.").

Third, as previously stated, the family court found that Mother caused a scene in the presence of Child at Child's school when Father's babysitter tried to pick up Child. This incident forced Father to leave work in order to resolve the issue with the school principal. The babysitter testified that Child's behavior that day was unusual because Child was typically eager to leave with her after school and enjoyed discussing his day with her. Additionally, the babysitter testified that once Child has stayed with Mother for a period of time, Child acts differently towards her. For instance, Child seemed upset around the babysitter and started saying that he did not feel safe at her house—something that Child had never said before. The family court found that Mother's actions caused Child to withdraw from his babysitter. Thus, it is evident that the family court's order contains sufficient findings addressing Mother's conduct and the adverse effect that it has on the welfare of Child. Although the family court did not reference the language in the Arbitrated Order—which provided that Mother must maintain therapy *and* control her anger in front of child and that failure to do so would constitute a "material" change from the circumstances under which extended visitation was granted—the family court took into consideration that Mother caused a scene at Child's school, which resulted in Child becoming upset. This incident alone is enough to be deemed a "material" change as provided by the Arbitrated Order.

Furthermore, based upon our view of the evidence, Mother's conduct adversely affected the welfare of Child and, thus, constituted a change in circumstances. *See Stoney*, 422 S.C. at 596, 813 S.E.2d at 487 ("[T]he proper standard of review in family court matters is de novo. . . ."). The record indicates that the stressful relationship between Mother and Father placed emotional and mental stress upon Child. For example, some of Child's anxiety was attributable to the high tension between his parents. Additionally, Child's guardian ad litem testified that she was concerned that Child's level of anxiety was related to his Mother's level of anxiety. *See Duck*, 297 S.C. at 139, 375 S.E.2d at 179 (providing visitation privileges can be denied when "their exercise would injure the child emotionally"). Father also testified that there is conflict between the two parties, much of which he believes is directed towards him. Father stated, "There's conflict in every which way. [Child] is a part of that. I believe a lot of the conflict is directed at me. [Child] is a victim of that. And my ability to parent [Child] is [a]ffected negatively by a lot of that conflict." Father explained that if he refused to discuss something with Mother that was not a "major parenting decision," Mother would resort to contacting law enforcement to perform well-checks or make allegations to child protective services. Father testified that Mother called the police to his home thirteen times while Child was in his care. When Mother was questioned on the number of times she called law enforcement, Mother stated that she called "[e]very time [she] heard [her] Child scream on the phone." Thus, it is apparent that Mother uses civil services to interfere with Father's ability to care for child. *See Sheila R. v. David R.*, 396 S.C. 41, 49–50, 719 S.E.2d 682, 686 (Ct. App. 2011) (upholding the family court's decision to change primary physical placement of a child from the mother to the father where it was necessary to "provide an immediate remedy to the child-related conflicts between Mother and Father," and to limit child's exposure to mother due to "numerous disturbing incidents, including Mother's unnecessary calls to law enforcement during Father's visits," and unsubstantiated accusations of father's drug use as well as a "pattern of inflexibility and uncooperativeness" with court-ordered provisions).

Additionally, Father testified that Child has been terminated from four service providers and another provider threatened termination. Child's guardian ad litem indicated in her report that Child had "access to valuable therapeutic services as a result of" the waiver with Hope Reach and she believed that Child "should be allowed to receive the benefit of those services[,] which could assist him with functioning as he matures." Father stated that Child has not been able to attend the therapy session for the past two years. Thus, the record reveals that Mother has interfered with Child's ability to receive medical treatment, Mother's actions have potentially damaged Child's relationship with his babysitter, and Mother uses every

tactic possible to make Father's life difficult. We believe that Mother has demonstrated that she is unable to control her anger in front of Child and that she is unable to cordially co-parent or communicate with Father or communicate with any medical providers Father has chosen for Child. Therefore, we find that it is not in Child's best interest to have expanded visitation with Mother. *See Lewis*, 400 S.C. at 367, 734 S.E.2d at 329 ("Our review of the preponderance of the evidence convinces us that, given the lack of cooperation and communication between the parties, allowing [the father] more extensive visitation would not be in [the child's] best interest."); *see also Kisling v. Allison*, 343 S.C. 674, 684–85, 541 S.E.2d 273, 278 (Ct. App. 2001) (finding substantial change in circumstances warranting a change in custody where, among other things, the mother exhibited poor judgment and instability, discouraged the child from visiting the father, and was the source of difficulties between the parties).

### III. Child's Best Interest

Mother contends the family court failed to consider and weigh the factors set forth in section 63-15-240(B), which provides, "In issuing or modifying a custody order, the court must consider the best interest of the child, which may include, but is not limited to" the several factors listed therein. S.C. Code Ann. § 63-15-240(B) (Supp. 2018). Additionally, Mother maintains that the family court's order is "ambiguous as to why" the change in visitation is in the child's best interest. We disagree.

First, we note that Mother failed to file a motion for reconsideration to request that the family court address the factors in section 63-15-240(B). "Therefore, when an appellant neither raises an issue at trial nor [files] a Rule 59(e), SCRCP, motion, the issue is not preserved for appellate review." *Srivastava v. Srivastava*, 411 S.C. 481, 487, 769 S.E.2d 442, 446 (Ct. App. 2015) (quoting *Doe v. Doe*, 370 S.C. 206, 212, 634 S.E.2d 51, 54–55 (Ct. App. 2006)); *id.* ("To preserve an issue for appellate review, the issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the [family] court." (quoting *Doe*, 370 S.C. at 212, 634 S.E.2d at 54)). Additionally, we note that section 63-15-240(B) indicates the family court *may* consider those factors but it is not limited to those factors. Therefore, the family court was only required to consider the best interests of the child, and the factors were listed to help guide the court in its analysis. *See Kennedy v. S.C. Ret. Sys.*, 345 S.C. 339, 352–53, 549 S.E.2d 243, 250 (2001) ("The use of the word 'may' [in a statute] signifies permission and generally means that the action spoken of is optional or discretionary unless it appears to require that it be given any other meaning in the present statute."). Even if the issue was preserved, a review of the

record indicates the family court considered several of the factors referenced in section 63-15-240(B), although the court did not list the factors out verbatim.

Furthermore, upon our view of the evidence, Child's best interest would be served by reducing Mother's visitation from expanded to standard because Child needs greater stability and consistency in his treatment. *See Stoney*, 422 S.C. at 596, 813 S.E.2d at 487 ("[T]he proper standard of review in family court matters is de novo. . . ."); *see also Paparella*, 340 S.C. at 191, 531 S.E.2d at 297 ("As with child custody, the welfare and best interests of the child are the primary considerations in determining visitation."). One of the biggest concerns that Child's therapists, counselors, guardian ad litem, and Father expressed to the family court was the fact that Child needed consistency and greater stability. Shockley testified that she believed Child needed a visitation schedule that would allow him to receive the therapy that he needed. As previously mentioned, the parties were operating on a 2-2-3 rotating schedule. After Hope Reach informed Father that they would only conduct therapy sessions at his home, the sessions were scheduled to occur on Wednesdays. However, due to the constantly rotating schedule, Child's therapists were meeting with Child every other Wednesday. Shockley stated that "things changed so frequently and it's irregular," and that Child "couldn't have a regular schedule." Welborn testified that one of the reasons Hope Reach terminated Child's therapy was the fact that both parents needed to reinforce certain behaviors in the same manner to help Child progress. Welborn explained that "things were [going to] be [reinforced] in different places, in different ways. And I felt like [child's behavioral problems] [were] [going to] be counterproductive for [Child]."

Lastly, Father testified that Child needed

> a more regular schedule. The 2-2-3 is not working for his age. He needs consistency. He's getting very different feedback from his two parents and it's hard for him to progress as he needs. My proposal is for [Child] to be with one parent primarily through the school week and alternating weekends.

Father also testified that when Child returns from Mother's house, Father feels that he has to "re-install" the rules, explaining, "Not just the rules at my house but the rules at the majority of the other environments." Therefore, we find it is in Child's best interest to reduce Mother's expanded visitation. *See Sheila R.*, 396 S.C. at 48, 719 S.E.2d at 685 ("In determining custody, the family court 'must consider the character, fitness, attitude, and inclinations on the part of each parent as they impact the child." (quoting *Woodall v. Woodall*, 322 S.C. 7, 11, 471 S.E.2d 154, 157

(1996))); *id*. ("[T]he totality of the circumstances peculiar to each case constitutes the only scale upon which the ultimate decision can be weighed." (quoting *Parris v. Parris*, 319 S.C. 308, 310, 460 S.E.2d 571, 572 (1995))).

**AFFIRMED.**[4]

**LOCKEMY, C.J., and THOMAS and GEATHERS, JJ., concur.**

---

[4] We decide this case without oral argument pursuant to Rule 215, SCACR.