771 S.E.2d 649

**George Francis BROWN, Appellant,**

v.

**Julie Krick BROWN, Respondent.**

**Appellate Case No. 2013–001259.**
**No. 5311.**

Court of Appeals of South Carolina.

Heard Dec. 10, 2014.

Decided April 8, 2015.

---

226

228

Sarah Ganss Drawdy, of Byrholdt Drawdy, LLC, of Anderson, for appellant.

Robert Scott Dover, of Law Offices of Scott Dover, of Pickens, for respondent.

Kelvin R. Kearse, of Easley, Guardian ad Litem.

WILLIAMS, J.

George Brown (Husband) appeals the family court's final divorce decree, arguing the family court improperly (1) divided the marital estate given the short duration of Husband and Julie Brown's (Wife) marriage, (2) awarded custody of the parties' minor children to Wife, and (3) ordered Husband to pay a portion of Wife's attorney's fees and guardian ad litem (GAL) fees. We affirm.

## FACTS/PROCEDURAL HISTORY

Husband and Wife married on January 1, 2003.[1] The majority of Husband and Wife's eight-year marriage was one of long distance. The day after the parties were married, Husband left for military training in California. Soon after the parties married, Wife became pregnant with triplets. In the four months prior to the triplets' birth, Wife was placed on complete bed rest by her treating physicians. Husband did not visit Wife while she was on bed rest because he was stationed in California.

Toward the end of Wife's bed rest, she unexpectedly went into preterm labor. Husband immediately flew across the country and arrived the morning after the triplets were born. He remained home for twelve days before returning to California. Because the triplets were born unexpectedly—and, thus, were significantly premature—they were hospitalized for fifty-two days after their birth. Other than the twelve days following their birth, Husband was unable to visit the triplets while they were hospitalized and was not present when the triplets were discharged from the hospital.

Wife was again bedridden from September 2004 to February 2005 following complications from surgery. During this time, Husband only returned home for several days around Christmas. Prior to the triplets' first birthday, Wife and the children drove across the country and relocated to California to be with Husband for approximately nine months. Thereafter, Wife and the triplets returned to Clemson, South Car-

---

1. This was the first marriage for both parties and neither party had any children from prior relationships.

olina. Husband then went to Texas and Arizona for additional military training while Wife and their children remained in South Carolina.

Husband was deployed with the U.S. military from October 13, 2006, until June 24, 2007. While deployed, Husband was notified by the American Red Cross that Wife had gone into early labor. Husband was able to return home from overseas on December 30, 2006, the day prior to the child's birth. Husband stayed with Wife and the children for six days before he had to return for his deployment in the Middle East.

Husband returned to South Carolina from his military deployment on June 30, 2007. He then left the country on July 5, 2007, to work as an independent government contractor in the Middle East. Husband ended his employment as a government contractor in the Middle East and returned home on December 22, 2010. The parties resided together in Clemson until Husband left on January 10, 2011, to take a job as a government contractor in Charlottesville, Virginia, approximately four hundred miles away. Husband's job in Charlottesville provided health insurance for Wife and their children. After Husband moved to Charlottesville, Wife filed for divorce on February 7, 2011. Upon Wife's filing for divorce, Husband relocated to Augusta, Georgia, and began working with a Virginia-based technology firm.

In Wife's complaint, she requested—among other relief—custody of the parties' children, temporary alimony, child support, equitable division of the marital estate, the appointment of a GAL, the issuance of restraining orders, and attorney's fees. Wife alleged that, in the four-year period from the birth of their fourth child until she filed for divorce, Husband only lived in the marital home for ninety-four days, which eventually caused the break-up of their marriage.

Husband answered and counterclaimed, seeking custody of the children, an order barring Wife from receiving alimony, equitable division of the marital assets and debts, and attorney's fees. While Husband acknowledged his military deployment and subsequent overseas employment as a government contractor contributed to the break-up of their marriage, he stated Wife's mismanagement of their finances and alleged adultery also contributed to the failure of their marriage.

The family court issued a temporary order on April 26, 2011, in which the court addressed several issues raised by the parties. In ordering joint custody, the family court stated Wife would be the primary custodian. The family court granted Wife four nights per week and Husband three nights per week in overnight visitation with the children. While in Husband's care, the family court designated Husband's mother (Grandmother) as the children's primary care provider. Because Husband commuted from Augusta to Clemson, Grandmother would care for the children until Husband arrived.

Regarding the parties' assets, the family court determined they had a joint checking account that contained approximately $80,000 prior to the commencement of litigation. The family court concluded Wife had already withdrawn $30,000 from this account. The court ordered Husband to retain the remaining $50,000 and for each party to be responsible for the preservation of the funds in his or her possession pending the outcome of the litigation.

The court also appointed a GAL to represent the interests of the minor children. Within one month of the temporary order, the GAL requested a hearing based on the GAL's concern with the escalating tension between the parties and its effect on the children. As a result of this hearing, the family court issued an order on July 19, 2011, and found Wife would retain primary custody of the children. Pursuant to the order, Husband's visitation was adjusted to accommodate the changing nature of his work schedule, and the parties were ordered to undergo a psychological evaluation.

In January 2012, Grandmother—who provided a substantial amount of care for the parties' children while in Husband's care—temporarily moved away from South Carolina to care for her daughter. Because Grandmother could no longer be children's primary caretaker while in Husband's custody, the parties began paying for children to have afterschool care in Clemson. At the end of that summer, Wife relocated the children to a new elementary school outside Clemson in which she worked as a special needs teacher. As a benefit of her employment, the elementary school provided afterschool child care to the children at no cost to Wife. In response to Wife's

decision to enroll the children at a new school, Husband moved for an expedited temporary relief hearing. Husband requested the family court change the custodial arrangement or require Wife to transfer the children back to their former elementary school. The family court denied Husband's motion.

The family court held a final hearing in February 2013. By the final hearing, Wife was employed full-time and earned $3,685 per month as a special needs teacher in Seneca, South Carolina. Husband earned $5,833 per month working in Augusta, Georgia, as an intelligence professional with a Virginia-based technology firm. At the final hearing, Husband and Wife submitted evidence and testimony to substantiate their claims to the family court.

During Husband's testimony, he explained why he was best suited to be the children's primary caretaker. Although Husband acknowledged he was frequently not present, he testified he had been very involved in the children's lives since he moved back from Virginia. Although Husband lived in Aiken and worked in Augusta, Husband testified he commuted weekly to spend time with their children. When in Clemson, Husband testified he was active in the children's education and routinely assisted the children with their homework. When the children were at their former elementary school, Husband stated he was a volunteer and chaperoned field trips. Husband adamantly opposed Wife's decision to change the children's schools, stating all of their friends and his extended family resided in the Clemson area, and their attendance at the new school in Seneca prevented him from volunteering or chaperoning their field trips.

When questioned about their marriage, Husband stated he did not initially want to get a divorce and tried talking to Wife to change her mind. Once they separated, Husband believed Wife was shirking her responsibilities and acting immaturely. Husband also believed Wife committed adultery during their marriage—while he was overseas—and testified that Wife's financial mismanagement of their money contributed to the break-up of their marriage.

In support of his claim that Wife managed the parties' money carelessly, Husband stated that while he was overseas,

his salary was deposited into a joint checking account to which Wife had full access. Husband claimed Wife spent his earnings frivolously and stated he only spent approximately $16,000 of the $600,000 he earned between 2008 and 2010. According to Husband, Wife greatly depleted their liquid assets because of her spending issues and diminished the value of their home by allowing it to fall into disrepair. Husband noted Wife's expenditures of almost $12,000 in 2010 for childcare expenses as evidence of Wife's spending habits.

Additionally, Husband discussed the children's health issues and his belief that Wife was not routinely administering the Synthroid medication for two of the children's hypothyroidism. In support of his claim, Husband introduced the deposition of Dr. Raymond Flanders, the children's pediatrician. In his deposition, Dr. Flanders stated two of the three triplets had hypothyroidism, which was being treated through the administration of Synthroid. Dr. Flanders' notes reflected that Wife was aware of this condition and advised of the proper medication and dosages for the treatment of hypothyroidism. In Dr. Flanders' medical opinion, the children were healthy and nothing in his records reflected the children were ever medically neglected.

Husband also submitted the deposition testimony of Dr. Elaine Moreland, a pediatric endocrinologist, who treated the children for their hypothyroidism. Dr. Moreland stated the increase in their thyroid-stimulating hormone level could have been caused by the girls outgrowing their dosage or by it not being administered on a daily basis.

Last, Husband submitted the deposition testimony of George Woodruff, Ph.D., a licensed clinical psychologist. Dr. Woodruff stated his interaction with the children stemmed from Grandmother's concerns of anxiety related to the children's adjustment issues. Based upon his counseling sessions, he concluded all of the children were emotionally secure and gave them a good prognosis. He stated all of the children had adjusted to their new school and were doing well, even without counseling. When questioned about a custody arrangement, he believed it was in the children's best interests to have a conventional custody arrangement with the noncustodial parent exercising visitation every other weekend and on holidays.

During Wife's testimony, she stated Husband's return overseas as a government contractor after his initial deployment with the military significantly contributed to the break-up of their marriage. Although she emailed him every day, she stated she only received phone calls from him once every two weeks, and it was very stressful not knowing what he was doing or whether he was safe. She testified, "I was constantly doing everything I could and I had had it. I needed to feel loved by him. I needed to feel appreciated and that he wanted to be a part of this family that I had been raising on my own." Wife complained to Husband numerous times about being employed overseas and stated that Husband was rarely home during their marriage. In addition to Husband's absence for the majority of the parties' marriage, Wife stated Husband treated her poorly and largely ignored her and their children. Despite Husband's negative view of Wife, she claimed Husband had no hesitation about moving to Charlottesville and leaving her in charge of their home and children immediately prior to the parties' separation.

Wife also responded to Husband's allegations of financial mismanagement, claiming she used funds from the parties' joint checking account for daily living and childcare expenses. Wife explained the child care expenses were reasonable because the expenses equated to only $221 per week for childcare for four children. Furthermore, Wife claimed Husband had access at all times to their joint bank account and a right to monitor its balance and any withdrawals while he was overseas.

After hearing testimony at trial and considering the evidence submitted by the parties, the family court issued a final order on April 30, 2013. In its lengthy order, the family court resolved all outstanding issues between the parties. As it relates to Husband's appeal, the family court (1) awarded Wife primary custody of the children, (2) awarded Wife 49.60% and Husband 50.40% of the marital estate, (3) ordered Wife to pay 40% of the GAL fees and Husband to pay 60% of the GAL fees, and (4) ordered Husband to pay 61% of Wife's attorney's fees. Husband appeals.

**STANDARD OF REVIEW**

"In appeals from the family court, this [c]ourt reviews factual and legal issues de novo." *Simmons v. Simmons*, 392

S.C. 412, 414–15, 709 S.E.2d 666, 667 (2011). Thus, this court has jurisdiction to find facts in accordance with its own view of the preponderance of the evidence; however, this broad scope of review does not require the court to disregard the findings of the family court, which is in a superior position to make credibility determinations. *Lewis v. Lewis*, 392 S.C. 381, 384–85, 709 S.E.2d 650, 651–52 (2011).

## LAW/ANALYSIS

### I. Equitable Division

■    Husband claims the family court erred in dividing the marital estate because Husband and Wife were only married for eight years, and he made far greater financial contributions to the acquisition of the marital assets. We disagree.

■    The division of the marital estate is within the discretion of the family court and will not be disturbed on appeal absent an abuse of discretion. *Craig v. Craig*, 365 S.C. 285, 290, 617 S.E.2d 359, 361 (2005). In reviewing a division of marital property, an appellate court looks to the overall fairness of the apportionment. *Deidun v. Deidun*, 362 S.C. 47, 58, 606 S.E.2d 489, 495 (Ct.App.2004) (citation omitted). If the end result is equitable, the fact the appellate court would have arrived at a different apportionment is irrelevant. *Id.*

■    Equitable distribution of marital property "is based on a recognition that marriage is, among other things, an economic partnership." *Morris v. Morris*, 335 S.C. 525, 531, 517 S.E.2d 720, 723 (Ct.App.1999) (citing *Mallett v. Mallett*, 323 S.C. 141, 150, 473 S.E.2d 804, 810 (Ct.App.1996)). "Upon dissolution of the marriage, marital property should be divided and distributed in a manner which fairly reflects each spouse's contribution to its acquisition, regardless of who holds legal title." *Id.*

Section 20–3–620 of the South Carolina Code provides factors for the family court to consider in apportioning marital property and instructs the family court to "give weight in such proportion as it finds appropriate" to each of the following factors:

(1) the duration of the marriage together with the ages of the parties at the time of the marriage and at the time of the divorce ...;

(2) marital misconduct or fault of either or both parties ...;

(3) the value of the marital property ...;

(4) the income of each spouse, the earning potential of each spouse, and the opportunity for future acquisition of capital assets;

(5) the health, both physical and emotional, of each spouse;

(6) the need of each spouse or either spouse for additional training or education in order to achieve that [spouse's] income potential;

(7) the nonmarital property of each spouse;

(8) the existence or nonexistence of vested retirement benefits for each or either spouse;

(9) whether separate maintenance or alimony has been awarded;

(10) the desirability of awarding the family home ...;

(11) the tax consequences to each or either party ...;

(12) the existence and extent of any support obligations, from a prior marriage ...;

(13) liens and any other encumbrances upon the marital property ...;

(14) child custody arrangements and obligations ...; and

(15) such other relevant factors as the [family] court shall expressly enumerate in its order.

S.C.Code Ann. § 20–3–620(B) (2014).

■ This court has held "[w]hile there is certainly no recognized presumption in favor of a fifty-fifty division, we approve [of] equal division as an appropriate starting point for a family court judge attempting to divide an estate of a long-term marriage." *Doe v. Doe*, 370 S.C. 206, 214, 634 S.E.2d 51, 56 (Ct.App.2006). The purpose of the general fifty-fifty division is to protect the nonworking spouse who undertook the household duties and to prevent an award based only on the parties' direct financial contributions. *Avery v. Avery*, 370 S.C. 304, 311, 634 S.E.2d 668, 672 (Ct.App.2006) (citation omitted).

Wife acknowledges—and we agree—that the parties' eight-year marriage was not a long-term marriage. Despite this fact, we believe the family court acted within its well-fettered discretion in awarding Wife 49.60% of the marital estate. We find the circumstances of the parties' marriage merit such an award as reflected by the family court's thorough consideration of all the relevant factors from section 20–3–620.

Husband cites to *Fitzwater v. Fitzwater*, 396 S.C. 361, 721 S.E.2d 7 (Ct.App.2011), and *Crossland v. Crossland*, 408 S.C. 443, 759 S.E.2d 419 (2014),[2] in support of his argument that Wife is not entitled to a fifty-fifty division of the marital assets; however, we find the facts in these cases distinguishable and not persuasive authority to overturn the family court's decision.

In *Fitzwater*, the family court awarded the husband 60% of the marital estate when the parties were married for ten years and had no children prior to or during their marriage. 396 S.C. at 365–66, 721 S.E.2d at 9–10. Further, the wife in *Fitzwater* brought little or no assets into the marriage, while the husband provided the majority of income and assets. *Id.* at 370, 721 S.E.2d at 12. Our court also acknowledged that, prior to their marriage, the husband paid off a significant premarital debt of the wife and gave her a house rent free to help the wife order her financial affairs. *Id.* Unlike the parties in *Fitzwater*, Husband and Wife have four children together. Neither party brought any preexisting obligations, debts, or assets into the marriage. All of Husband and Wife's wealth was accumulated during the marriage, and the parties' decision for Wife to stay at home and care for their four

---

2. Husband cites to the court of appeals' decision in *Crossland v. Crossland*, 397 S.C. 406, 725 S.E.2d 509 (Ct.App.2012), in support of his argument. Our court reversed the family court's decision to award the wife 40% of the marital estate, instead finding a more appropriate apportionment would be to grant 30% of the marital estate to the wife. *Id.* at 417, 725 S.E.2d at 515. The supreme court had yet to render a decision in *Crossland* at the time the parties filed their briefs with our court. However, since that time, the supreme court ruled in *Crossland* and reinstated the family court's 40/60 division between the wife and husband. 408 S.C. at 459, 759 S.E.2d at 427. Because the court of appeals' decision is no longer good law as it pertains to the division of the marital estate, we reference the supreme court's opinion from *Crossland* in this court's analysis.

children enabled Husband to accumulate the wealth to which Husband now claims he is entitled to a greater share.

Similarly, we find the facts in *Crossland* differ greatly from the facts in the instant case. In *Crossland,* the parties were previously married with grown children. 408 S.C. at 447, 759 S.E.2d at 421. The parties were of retirement age and had no children during their ten-year marriage. *Id.* The husband brought substantial assets into their marriage, whereas the wife owned no assets at the time of the marriage and only worked briefly for one year during their marriage. *Id.* at 447–48, 759 S.E.2d at 421–22. The parties suffered from various health problems, and the wife's health issues prevented her from maintaining gainful employment. *Id.* at 448–49, 759 S.E.2d at 422. Further, the wife left the husband on multiple occasions throughout their marriage. *Id.* at 449, 759 S.E.2d at 422. The husband estimated the wife only lived in the marital home for five years of their ten-year marriage based on various separations initiated by the wife. *Id.*

Unlike the parties in *Crossland,* Husband and Wife were never previously married, and they have four minor children, all born during the marriage. Both Husband and Wife are in good health and not close to retirement age. Moreover, Wife never abandoned Husband or their children at any point during the parties' marriage. Although both Husband and the husband in *Crossland* made far superior financial contributions to the acquisition of the marital estate, we—like the supreme court—do not find the greater financial contributions outcome determinative, particularly when Wife's indirect contributions to the marriage far outweighed those of Husband. *See id.* at 458, 759 S.E.2d at 427 ("Although greater direct financial contributions may properly be considered in apportioning a marital estate, that factor is but one of many factors to be considered and does not alone overshadow all of the other relevant factors examined by the family court.").

In sum, none of the facts in *Crossland* or *Fitzwater* mirror those found in this case. Further, we agree with the family court's consideration of the factors in section 20-3-620. Thus, we find no basis to reverse the family court's equitable division award.

## II. Custody Determination

██  Next, Husband claims the family court erred in awarding Wife custody of the parties' children. Specifically, Husband contends the family court failed to address the testimony of Dr. Moreland when it concluded Wife would have custody of the minor children, thereby necessitating a reversal of the family court's custody determination. We disagree.

██  The controlling considerations in child custody cases are the welfare of the children and what is in their best interests. *Ford v. Ford,* 242 S.C. 344, 349, 130 S.E.2d 916, 920 (1963) (citation omitted). In making its determination on custody, the family court should "consider the character, fitness, attitude, and inclinations on the part of each parent as they impact the [children]," as well as "the psychological, physical, environmental, spiritual, educational, medical, family, emotional and recreational aspects" of the children's lives. *Woodall v. Woodall,* 322 S.C. 7, 11, 471 S.E.2d 154, 157 (1996) (citation omitted). It is also appropriate for the family court to account for who has been the primary caretaker and consider the opinions of third parties, such as a GAL, expert witnesses, and the children. *Lewis v. Lewis,* 400 S.C. 354, 364, 734 S.E.2d 322, 327 (Ct.App.2012) (citation omitted).

██  "[A]ll the conflicting rules and presumptions should be weighed together with all of the circumstances of the particular case, and all relevant factors must be taken into consideration." *Woodall,* 322 S.C. at 11, 471 S.E.2d at 157 (citation omitted). While this court has jurisdiction to correct errors of law and find facts in accordance with its own view of the preponderance of the evidence, child custody decisions are matters left largely to the discretion of the family court. *Shirley v. Shirley,* 342 S.C. 324, 329–30, 536 S.E.2d 427, 429–30 (Ct.App.2000) (citations omitted). Thus, this court "should be reluctant to substitute its own evaluation of the evidence on child custody for that of the [family] court." *Woodall,* 322 S.C. at 10, 471 S.E.2d at 157 (citation omitted).

Despite the family court's lack of reference to Dr. Moreland's testimony in its final order, based on our review of the evidence, we do not believe the exclusion of her testimony from the order would require a reversal of the court's custody decision. Dr. Moreland stated the higher level of hormones in

the children's bodies after prescribing the Synthroid was either due to the children's growth or inadequate daily dosage. Further, Wife testified extensively at trial about her recollection of Dr. Moreland's treatment of the girls. Wife stated she was aware of Dr. Moreland's treatment through the children's pediatrician, as Husband and Grandmother always took the children to those appointments. The family court was in the best position to assess Wife's credibility and her testimony, and because of its superior position to make credibility determinations, we defer to the weight the family court afforded Wife's testimony as it pertained to the children's health issues and medical treatment. *See Lewis,* 392 S.C. at 384–85, 709 S.E.2d at 651–52 (stating our broad scope of review does not require this court to discredit the family court's findings because the family court is in a superior position to make credibility determinations).

Husband also contends the family court did not recognize Wife's failure to adequately acknowledge two of the children's medical conditions and administer the appropriate dosages of medication to control their thyroid condition. Despite the conflict in the parties' testimony over this issue, Husband has presented no evidence that Wife refused to properly attend to the children's medical needs. To the contrary, the text message to which Husband cites in his brief demonstrates that Wife was aware of their hypothyroidism and had been proactive in teaching their daughter to take her pill. Specifically, the text message from Wife to Husband reads, "[Child] is on Synthroid. I taught her how to swallow a pill. She takes it with milk. I'll make sure you have it Saturday night." We find this text message is evidence that not only did Wife appreciate the nature of their children's conditions, but she also took efforts to ensure Husband would have the medication while the children were in his care.

Although not outcome determinative in a custody dispute, Wife has been the children's primary caretaker for the entirety of their lives. We find Wife's role as primary caretaker to be a notable consideration by the family court. Further, we discern no evidence that Husband questioned Wife's abilities to care for their children while he was across the country or overseas. Despite Husband's derogatory comments toward Wife once she filed for divorce, when questioned by the GAL

at the final hearing, Husband testified Wife was an "incredible mother." The testimony of Dr. Flanders, the children's pediatrician, also supports our conclusion that Wife took appropriate medical care of the children. He specifically testified that all the children were healthy, and none of them were medically neglected. Dr. Flanders also stated Wife was aware of the children's medical conditions and knew the appropriate dosages for treating their hypothyroidism.

Based on our review of the record, we find both parents are fit to be the children's primary custodian; however, we believe Wife is best suited to have primary custody of the children. Again, Wife has been the children's primary caretaker for the entirety of their lives. Husband set forth no witnesses at the final hearing who stated Wife was an unfit parent or lacked the appropriate attitude or inclination to care for the children. The children attend the same school where Wife teaches, and Husband's employment requires him to frequently travel. Awarding Husband primary custody of the children would also require the children to move, which we do not believe would be in the children's best interests. Based on the foregoing, we find the family court properly took all the relevant considerations in mind when awarding Wife primary custody of the parties' children. Accordingly, we affirm the family court's custody determination.

## III.  Fees

Last, Husband argues the family court erred in the amount of GAL and attorney's fees it ordered him to pay in the final order. We disagree.

### A.  Attorney's Fees

Husband first claims the family court erred in requiring him to pay 61% of Wife's attorney's fees. We disagree.

The family court may order one party to pay a reasonable amount to the other party for attorney's fees and costs incurred in maintaining an action for divorce. *See* S.C.Code Ann. § 20-3-130(H) (2014). In determining the reasonableness of attorney's fees, the family court should take six factors into consideration: "(1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the

case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; and (6) customary legal fees for similar services." *Glasscock v. Glasscock,* 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991) (citing *Donahue v. Donahue,* 299 S.C. 353, 365, 384 S.E.2d 741, 748 (1989)).

The family court ordered Husband to pay 61% of Wife's attorney's fees, thereby awarding Wife $26,230 of her attorney's fees after determining (1) the case was pending for two years and the trial took place over three days; (2) the time devoted by Wife's counsel was necessary given the nature, extent, and difficulty of the case in conjunction with the fact that Husband hired three different attorneys over the course of the litigation; (3) both parties' attorneys had high professional standing in their respective legal communities; (4) Wife succeeded in securing almost 50% of the marital estate and obtaining custody of the parties' four children; and (5) the fees and litigation expenses incurred by Wife were reasonable. We find the family court's assessment of attorney's fees against Father is reasonable given the foregoing factors and, thus, we affirm the family court's decision to order Husband to pay $26,230 of Wife's attorney's fees.

### B. GAL Fees

■ Husband also contends the family court erred in ordering him to pay 60% of the $22,787.64 in GAL fees. Instead, Husband argues the family court should have required each party to pay 50% of the GAL fees. We disagree.

■ An award of GAL fees lies within the sound discretion of the family court and will not be disturbed on appeal absent an abuse of discretion. *Nash v. Byrd,* 298 S.C. 530, 537, 381 S.E.2d 913, 917 (Ct.App.1989) (citation omitted).

Neither party contests the reasonableness of the GAL fee. Rather, Husband claims Wife should be required to pay a slightly greater share of the fees based upon her "lack of cooperation and candor during the litigation." We disagree with Husband's claim that Wife was uncooperative and not forthright during the course of the litigation. As Wife highlights in her brief, Husband admitted at the final hearing that he submitted false statements in affidavits to the family court on at least five occasions and made several omissions and

misrepresentations in his equitable apportionment worksheet. As a result, we assign less credibility to Husband's claim that Wife's actions unnecessarily prolonged the litigation and warranted a greater assessment of fees against her.

We also find Husband failed to demonstrate he was prejudiced by the family court's division of these fees. In its order, the family court held, "In making this allocation, the court is aware that some of the money paid by [Husband] was paid from marital funds during this action. In the overall allocation, the court will assign [Husband's] payments as though he paid them from his own funds. This should offset the Husband's additional 10% assigned." Husband submitted no proof on appeal that the family court's statement was in error. Accordingly, we find the family court properly ordered Husband to pay the remaining GAL fee balance of $7,766.33.

## CONCLUSION

Based on the foregoing, the family court's decision is

**AFFIRMED.**

GEATHERS and McDONALD, JJ., concur.